**In re TRAVIS.**

[Cite as *In re Travis* (1996), 110 Ohio App.3d 684.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 95APF10–1303.

Decided April 30, 1996.

*Michael Miller,* Franklin County Prosecuting Attorney, *Diane Paul Fox* and *Keith A. Cornwell,* Assistant Prosecuting Attorneys, for appellee state of Ohio.

*Wallace & Warner Co., L.P.A.,* and *Roger Warner,* for appellant.

PETREE, Presiding Judge.

On March 11, 1994, a complaint was filed in the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, charging appellant, Chad Travis, with possession of dangerous ordnance in violation of R.C. 2923.17. The matter was heard before a referee, who recommended that the court find appellant to be a delinquent minor, having committed the offense of possession of dangerous ordnance, and require appellant to perform thirty hours of community service by April 15, 1995.

Appellant sets forth the following assignments of error:

"[I.] Trial court erred in finding that the minor child possessed dangerous ordnance within the meaning of R.C. 2923.17(A).

"[II.] Assuming, *arguendo*, that R.C. 2923.17(A) is found to be a strict liability statute, then appellant's ignorance of the law should bar a delinquency finding as a matter of due process.

"[III.] The trial court erred in not suppressing any statements elicited from the minor child in that the statements were obtained in violation of his constitutional rights under both the Ohio and United States Constitutions."

On March 6, 1994, Columbus Police Officers John Mancini and Todd Kerin were dispatched to a residential area, near Krumm Park, to investigate a complaint of possible gunshots. As the officers neared the park, they noticed appellant running across the street and yelled for him to stop. As they approached appellant, the officers heard a hissing sound and noticed a plume of smoke emanating from the park. Officer Kerin headed toward the object in the park while Officer Mancini waited with appellant. At this time, appellant make two spontaneous statements to Officer Mancini: (1) "some guy set that thing off over there"; and (2) "it was a bomb thing."

Officer Mancini instructed his partner to stop proceeding toward the object and asked appellant what the bomb was made of. At that time, appellant responded that the bomb was made of "the Works and stuff." Officer Mancini testified that he asked appellant this question because he was concerned about public safety inasmuch as appellant had said they were dealing with a bomb. Officer Kerin approached and asked appellant if he had set the bomb thing off, and appellant responded that he had and that he was sorry. The officers contacted the fire department and placed appellant in the back of the cruiser until his parents could be notified. Both officers testified that they had no further conversations with appellant regarding the incident.

Battalion Chief Howard E. White of the Columbus Division of Fire arrived on the scene and called for an arson investigator. Investigator Larry Pfeifer

responded to the scene. Based upon the evidence collected, it was determined that a toilet bowl cleaner called "The Works" was being placed into plastic cola bottles along with aluminum foil. The bottles are then sealed. Toilet bowl cleaners contain hydrochloric acid, and when they are combined with aluminum foil and shaken, a chemical reaction results. The bottles swell, and when the pressure reaches approximately one hundred fifty pounds per square inch, the bottles explode. Apparently, glass bottles were also being used, and, in fact, the hissing sound heard by the officers when they approached the park was emanating from a glass bottle containing the "The Works" and aluminum foil. Apparently, the lid was not screwed on tight enough and the hissing sound was caused by the gas escaping through the top of the bottle.

Pfeifer directed appellant's mother to bring her son to his office the next morning to finish the investigation. Another boy, who was involved in these activities with appellant, and his mother were also directed to come to Pfeifer's office the next morning. At that time, Pfeifer reviewed the department's standard investigative form and further explained the constitutional rights waiver contained therein. Appellant made both an oral statement and a written statement at that time.

Appellant's third assignment of error will be addressed first. Appellant argues that the trial court erred by not suppressing any statements elicited from him on the evening of March 6, 1994 because the questioning went beyond the need to establish public safety and because appellant was detained. Appellant also argues that he felt coerced into making a statement on March 7, 1994.

In *State v. Barker* (1978), 53 Ohio St.2d 135, 7 O.O.3d 213, 372 N.E.2d 1324, the Ohio Supreme Court set forth a four-prong test to determine whether a custodial interrogation is taking place such that *Miranda* warnings should be given. The court stated that a person should be given *Miranda* warnings under the following circumstances:

" * * * (1) [Where there is] an intent to arrest, (2) under real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested." *Id.* at paragraph one of the syllabus.

In determining whether a confession was voluntary, the court stated that the "totality of the circumstances" must be considered, including the following:

"[T]he age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. * * * " *Id.* at paragraph two of the syllabus.

■ A panel of this court has found that other factors should be considered when dealing with juveniles. In *In re Chavis* (July 23, 1994), Franklin App. No. 84AP–80, unreported, 1984 WL 5805 this court held that the age, educational and cultural background, worldly maturity, and prior experiences with police procedures and arrest should also figure into the equation. *Id.* at 11–12.

■ Finally, it is well established that the *Miranda* warnings need not be strictly adhered to in situations when police officers are reasonably prompted to ask questions where public safety is at issue. See *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 97 S.Ct. 711, 713–714, 50 L.Ed.2d 714; *California v. Beheler* (1983), 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275; and *New York v. Quarles* (1984), 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550.

Appellant urges this court to find that both the statements made by appellant to officers on March 6, 1994, as well as the statements made to Investigator Pfeifer on March 7, 1994, were taken in violation of his constitutional rights. Based upon a review of the record, this court concludes that appellant's third assignment of error is without merit.

■ When the police officers approached Krumm Park on the evening of March 6, 1994, based upon a complaint of possible gunshots being fired, they noticed appellant running out of the park. At that time, the police officers had no idea what type of activity was taking place in the park. In order to assess the situation and out of concern for public safety, the officers asked appellant to stop and asked him what was going on. Appellant responded that "some guy set that thing off over there," and that "it was a bomb thing." At the time, appellant was not in custody, and, inasmuch as appellant was seen running from the park, the only reasonable response for the police officers to make was to inquire of appellant if he knew what was going on in the park. Furthermore, Officer Kerin's question asking appellant if he set the device off was not improper. At the time, the police did not know exactly what they were dealing with, and Officer Kerin had just been informed that the device was some type of bomb. Again, it was reasonable for the police to inquire what further knowledge appellant might have about the device. In this type of situation, the police must quickly assess the situation so that they can take appropriate precautions to ensure both their safety and the safety of the general public. Nothing in the record indicates that appellant was threatened by the police or that he was under arrest at this time. The fact that appellant was subsequently placed in the police cruiser until his mother arrived on the scene does not change the nature of the initial questioning. The police specifically testified that the only questions asked of appellant after he was placed in the cruiser were questions to determine general information about him so that they could contact his mother. Appellant was not asked any more questions about his involvement with the device in the park. Appellant was a

juvenile and it was proper for the police to release him into the custody of a parent. He was not placed under arrest.

■ Appellant also argues that Investigator Pfeifer intimidated appellant's mother into believing that he could either arrest her son or have him taken away from her if she did not agree to bring him to Investigator Pfeifer's office the next day for an interview. The fact that Investigator Pfeifer may have informed appellant's mother that he had the power to arrest appellant does not, in and of itself, make appellant's written statement involuntary. The record indicates that Investigator Pfeifer explained appellant's constitutional rights to him and his mother and that they both understood the nature of the rights. There is no evidence to suggest that appellant was mentally or physically incapable or incompetent to make a written statement, and his mother was present during this time. Furthermore, as the court found, the limited length and intensity of the investigation, the lack of any inducements or threats, appellant's age and his willingness to cooperate are all factors which indicate that appellant's written statements were voluntary and were made with full knowledge of his rights.

Based upon the totality of the circumstances, this court finds that appellant's constitutional rights were not infringed at any time during the investigation and that both the oral and written statements were voluntary in nature. Therefore, appellant's third assignment of error is not well taken and is overruled.

■ Appellant's first and second assignments of error are interrelated and will be addressed together. Appellant argues that the trial court erred in finding that he had possessed "dangerous ordnance" within the meaning of R.C. 2923.17(A) because there was no intent to harm persons or property on the night in question. Since there was no intent to harm persons or property, appellant argues that he cannot be found delinquent.

R.C. 2923.17 provides as follows:

"(A) No person shall knowingly acquire, have, carry, or use any dangerous ordnance."

■ According to R.C. 2923.11(K), dangerous ordnance includes the following: "(2) Any explosive device or incendiary device." R.C. 2923.11(H) defines an "explosive device" as follows:

"[A]ny device designed or specially adapted to cause physical harm to persons or property by means of an explosion, and consisting of an explosive substance or agency and a means to detonate it. 'Explosive device' includes without limitation any bomb, any explosive demolition device, any blasting cap or detonator containing an explosive charge, and any pressure vessel which has been knowingly tampered with or arranged so as to explode."

Appellant makes the same argument before this court that he made at trial. Appellant contends that the bottles at issue did not fit under the definition of "explosive devices," under R.C. 2923.11(H) because they were not designed with the intent to harm persons or property. By this, appellant argues that he did not "knowingly" possess "dangerous ordnance" as it is defined in R.C. 2923.17(A).

First of all, the devices at issue fit within the definition of an "explosive device" in R.C. 2923.11(H). A two-liter soda pop bottle, by itself, will not explode. However, when toilet bowl cleaner, containing hydrochloric acid, and aluminum foil are combined inside the bottle, and the bottle is sealed and shaken, the bottle has become a device designed or adapted to explode. Furthermore, the record indicates that the explosion of such a device can cause physical harm to persons or property. Investigator Pfeifer testified that the explosion could remove fingers, or that the detergent could be injected into the skin. Hydrochloric acid is corrosive to paint and to aluminum screen doors. If human beings are in close proximity when the device explodes, there is a high probability that they will be hurt.

As previously indicated, "knowingly" is the culpable mental state required under R.C. 2923.17(A). Pursuant to R.C. 2901.22(B), "[a] person acts knowingly, *regardless of his purpose*, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." (Emphasis added.) Although the trial court specifically found that appellant did not intend to hurt anyone or to cause any property damage, that fact is immaterial. Appellant was aware that the device would explode and that it would cause a loud noise. Regardless of his intent to cause harm, appellant knowingly possessed dangerous ordnance in violation of R.C. 2923.17.

■ Appellant argues further that he was ignorant of the fact that the possession of a pressure vessel was illegal in that he lacked notice of that fact. Appellant relies upon *Lambert v. California* (1957), 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228, wherein the United States Supreme Court struck down an ordinance making it unlawful for a previously convicted felon to remain in the city for more than five days without registering with the chief of police. The court found that the convicted felon was unaware of the requirement that he must register himself with the local police chief before establishing residency. The court found that the ordinance in question imposed strict liability for conduct which was wholly passive. However, the *Lambert* case differs from this case.

In the present case, it is hard to comprehend that appellant did not know that what he was doing was wrong. Appellant knew that the device would explode. The record indicates that, whether or not the boys were successful in causing a glass bottle to explode, the last device with which the boys tampered was a glass

bottle into which the boys had poured toilet bowl cleaner and used aluminum foil. If this device had exploded and if either of the boys had been anywhere near the device when it exploded, it cannot be disputed that they would have been injured. Appellant was seen running from the park. It is reasonable to conclude that he was running from the park in order to avoid being injured or discovered. Furthermore, when Officer Kerin asked appellant if he was the person who set off the "bomb thing," appellant responded that he had and that he was sorry. Appellant knew that he was doing something that he should not be doing. The fact that appellant did not fully comprehend the gravity of his actions is not violative of his rights. Appellant's first and second assignments of error are not well taken and are overruled.

Based on the foregoing, appellant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.

*Judgment affirmed.*

TYACK and BROGAN, JJ., concur.

JAMES A. BROGAN, J., of the Second Appellate District, sitting by assignment.