**Certiorari Granted, August 16, 2013, No. 34,235**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2013-NMCA-091**

**Filing Date: June 6, 2013**

**Docket No. 32,046**

**STATE OF NEW MEXICO,**

        **Plaintiff-Appellant,**

**v.**

**KEVIN ALVERSON,**

        **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**James Waylon Counts, District Judge**

Gary K. King, Attorney General
Pranava Upadrashta, Assistant Attorney General
Santa Fe, NM

for Appellant

The Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellee

**OPINION**

**SUTIN, Judge.**

**{1}**     Owing to his possession of what the State characterized as "dry ice bombs," Defendant Kevin Alverson was charged with possession of an explosive or incendiary device, contrary to NMSA 1978, Section 30-7-19.1 (1990), a fourth degree felony. The district court dismissed the charge as a matter of law. The State appeals. We hold that the device was neither an "explosive" nor an "explosive device" under New Mexico law.

Accordingly, we affirm.

**BACKGROUND**

**{2}** In September 2011, Officer Karl Becker of the Alamogordo Department of Public Safety made "public contact" with Defendant, who was seated in his car. Officer Becker recognized Defendant to be a person whose driver's license was suspended or revoked, a fact that he later confirmed with dispatch. Defendant consented to a vehicle search. During the search, Officer Becker found, in pertinent part, two bottles with dry ice and two partially full gallon jugs of water. Officer Becker recognized that the jugs of water were "a precursor to make the dry ice generate explosive gases in the bottles." According to Officer Becker, Defendant stated that "he and a friend were going to go to a desert area [to] detonate them." Defendant was arrested and charged with possession of an explosive or incendiary device based on allegedly "knowingly and unlawfully possess[ing], manufactur[ing,] or transport[ing an] explosive device, incendiary device[,] or complete combination of parts needed to make such a device, a fourth degree felony, contrary to Section 30-7-19.1[.]"

**{3}** Defendant filed a motion to dismiss the charge of possession of an explosive or incendiary device. He argued that, as a matter of law, the items found in Defendant's possession did not meet the definition of an "explosive device" as defined in NMSA 1978, Section 30-7-18(B) (1990) of the Explosives Act, NMSA 1978, §§ 30-7-17 to -22 (1981, as amended through 1990). He further argued that pursuant to the principles of statutory construction the items were not contemplated by the Legislature to be encompassed within the definitions of a "destructive device" in NMSA 1978, Section 30-7-16(C)(1) (2001), or "explosive device" in Section 30-7-18(B).

**{4}** In opposition, the State argued, among other things, that Defendant, by his own admission, intended to make dry ice bombs[1] and that his intent combined with the fact that he possessed the necessary components to assemble such "bombs" rendered Section 30-7-18(B) applicable in this case. Alternatively, the State argued that Defendant's argument raised a question of fact and that the charge should not be dismissed as a matter of law.

**{5}** After a hearing on Defendant's motion to dismiss, the district court entered an order granting the motion as a matter of law. The court explained that Sections 30-7-18 and 30-7-19.1 refer to explosives and explosive devices that are caused by "chemical reactions caused

---

[1] "Dry ice is carbon dioxide . . . in solid form. . . . At normal temperatures, dry ice changes from a solid to gas rapidly and, increasingly so when placed in water and agitated. In the transition from solid to gas, its volume increases 500 times, and, when confined, as in a bottle, the pressure exerted naturally increases, and, if the container cannot withstand the expansion, it must burst." *N.Y. Eskimo Pie Corp. v. Rataj*, 73 F.2d 184, 185 (3d Cir. 1934). This is commonly referred to as a "dry ice bomb." *See, e.g.*, *In re Joseph S.*, 698 N.W.2d 212, 226-27 (Neb. Ct. App. 2005).

2

by burning or by fire rather than by expansion of gases under pressure." The court found that because dry ice bombs result from the expansion of gases, rather than by fire or burning, they are not prohibited by Section 30-7-19.1. The court further found that our Legislature could have added certain language that exists in other states' statutes that addresses dry ice bombs, but chose not to include such language. Accordingly, the court found that "the dry ice bombs possessed by Defendant [were] not made illegal by . . . [Section] 30-7-19.1," and it dismissed the charge against Defendant with prejudice. The State appeals from that ruling.

## DISCUSSION

**{6}** The issue is whether a dry ice bomb comes within the definition of an explosive device[2] as contemplated by Section 30-7-19.1. "Interpretation of a statute is a matter of law, which we review de novo." *State v. Rivera*, 2004-NMSC-001, ¶ 9, 134 N.M. 768, 82 P.3d 939 (internal quotation marks and citation omitted). The appellate courts endeavor to determine and give effect to the intent of the Legislature. *See State v. Johnson*, 2009-NMSC-049, ¶ 10, 147 N.M. 177, 218 P.3d 863. In doing so, we look first to the statute's plain language and interpret statutes as a whole. *State v. Davis*, 1998-NMCA-148, ¶ 19, 126 N.M. 297, 968 P.2d 808. Where the statutory language "is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *Rivera*, 2004-NMSC-001, ¶ 10 (internal quotation marks and citation omitted). Often, however, an analysis of the statutory language or its "plain meaning" does not end the analysis, and we must rely on other principles of statutory construction. *Id.* ¶¶ 12-14.

**{7}** Under Section 30-7-19.1(A) of the Explosives Act,

> [p]ossession of an explosive device or incendiary device consists of knowingly possessing, manufacturing[,] or transporting any explosive device or incendiary device or complete combination of parts thereof necessary to make an explosive device or incendiary device. This subsection shall not apply to any fireworks as defined in Section 60-2C-2 NMSA 1978 or any lawfully acquired household, commercial, industrial[,] or sporting device or compound included in the definition of explosive device or incendiary device in Section 30-7-18 NMSA 1978 that has legitimate and lawful commercial, industrial[,] or sporting purposes or that is lawfully possessed under Section 30-7-7 NMSA 1978.

**{8}** Section 30-7-18 provides definitions of terms used in the Explosives Act. Section 30-7-18(A) states that the term " 'explosive' means any chemical compound or mixture or device, the primary or common purpose of which is to explode and includes but is not limited to dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonators, safety fuses, squibs, detonating cord, igniter cord[,] and igniters[.]"

---

[2] The State concedes that Defendant did not possess an "incendiary device."

In pertinent part, Section 30-7-18(B) defines "explosive device" as "(1) any explosive bomb, grenade, missile[,] or similar device; [or] (2) any device or mechanism used or created to start a fire or explosion with or without a timing mechanism except cigarette lighters and matches[.]"

**The Applicability of Section 30-7-18(B)(1)**

**{9}** The State argues that a dry ice bomb is an "explosive bomb" or "similar device" under Section 30-7-18(B)(1). The State acknowledges that because "explosive" modifies "bomb" in Section 30-7-18(B)(1), the definition of "explosive" provided in Section 30-7-18(A) applies to Subsection (B)(1). Thus, whether a dry ice bomb is an "explosive bomb" depends on whether it is an "explosive" as defined by Section 30-7-18(A), and if so, whether it is also a "bomb," which is a term that is undefined in the Explosives Act.

**{10}** The State argues that "[a] dry ice bomb falls within [Section 30-7-18(A)] because it is a mixture of two chemical compounds (dry ice (solid $CO_2$) and water (liquid $H_2O$)) in a closed container, and the primary or common purpose of this mixture is to create an explosion." Relying on the principle of ejusdem generis, Defendant argues that the physical expansion of compressed gas that characterizes a dry ice bomb is inconsistent with "explosive" as defined by, and exemplified in, Section 30-7-18(A). The parties also disagree about whether a dry ice bomb is a "bomb" as that term is commonly understood.

**{11}** "The rule of ejusdem generis requires[] that where general words follow an enumeration of persons or things of a particular and specific meaning, the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those specifically mentioned." *State v. Office of Pub. Defender ex rel. Muqqddin*, 2012-NMSC-029, ¶ 29, 285 P.3d 622 (internal quotation marks and citation omitted); *see* NMSA 1978, § 12-2A-20(A) (1997) (codifying the principle of ejusdem generis as an aid to statutory construction). From the definition in Section 30-7-18(A), there is no indication that the Legislature intended "explosive" to cover the dry ice and water combination that leads to the explosion of a jug or a bottle by virtue of the physical change of $CO_2$ from a solid to a gaseous state. The list of enumerated examples of "explosive" in Section 30-7-18(A) share in common the element of combustion. Thus, the potential harm caused by "dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonators, safety fuses, squibs, detonating cord, igniter cord, and igniters" all result from or cause fire. *Id.* It is undisputed that a dry ice bomb does not involve the use of nor does it cause fire. Because a dry ice bomb does not fit within the class of devices enumerated in Section 30-7-18(A), the principle of ejusdem generis compels a conclusion that the Legislature did not intend the term "explosive" to cover the combination of dry ice and water in a closed container.

**{12}** We need not consider whether a dry ice bomb is a "bomb" as that term is commonly understood. The Legislature chose to modify the term "bomb" in Section 30-7-18(B)(1) with the adjective "explosive." Even assuming, without deciding, that a dry ice bomb is a

4

"bomb," it nevertheless does not come within the definition of Subsection (B)(1) because it is not also an "explosive." *See State v. Jackson*, 2010-NMSC-032, ¶ 28, 148 N.M. 452, 237 P.3d 754 ("It is fundamental that a statute should be so construed that no word, clause, sentence provision[,] or part thereof shall be rendered surplusage or superfluous." (internal quotation marks and citation omitted)).

**{13}** Nor do we believe that a dry ice bomb falls within the scope of Section 30-7-18(B)(1) as a "similar device" to an explosive bomb, grenade, or missile. Like explosive bombs, grenades and missiles are associated with fire or combustion. Moreover, explosive bombs, grenades, and missiles are similar to one another insofar as they are commonly associated with large scale explosions and military combat. The same would not be said of a dry ice bomb. Because a dry ice bomb would not rationally be characterized as "similar" to an explosive bomb, a grenade, or a missile in terms of its components, its destructive force, or its use, the principle of ejusdem generis precludes a conclusion that it comes within the ambit of "similar device" under Section 30-7-18(B)(1). In sum, Subsection (B)(1) is inapplicable to this case.

**The Applicability of Section 30-7-18(B)(2)**

**{14}** The State argues, in the alternative, that a dry ice bomb is an explosive device as set out under Section 30-7-18(B)(2) because it "is a device or mechanism created to start an explosion." The State argues that unlike Subsection (B)(1), Subsection (B)(2) does not employ the use of the modifying adjective "explosive." Therefore, the State argues, in interpreting the scope of the definition provided in Subsection (B)(2), "there is no need to refer back to the meaning of the term ['explosive.['] "

**{15}** The ordinary definition of "explosion" invokes the concept of bursting as the result of the expansion of gases and/or internal pressure, which, as Defendant concedes, is the reaction sought from and expected of a dry ice bomb. *See Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary/explosion (last visited May 30, 2013) (defining "explosion" as "1: the act or an instance of exploding . . . 2: a large-scale, rapid, or spectacular expansion or bursting out or forth"); *Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary /explode (last visited May 30, 2013) (defining "explode" or "exploding" as "1: to burst forth with sudden violence or noise from internal energy: as [(a)]: to undergo a rapid chemical or nuclear reaction with the production of noise, heat, and violent expansion of gases . . . [or (b)]: to burst violently as a result of pressure from within"); *see also The American Heritage Dictionary of the English Language*, http://ahdictionary.com/word/search.html?q=explode (last visited May 30, 2013) (providing the definition of "explode," to include, "[t]o release mechanical, chemical, or nuclear energy by the sudden production of gases in a confined space" or "[t]o burst violently as a result of internal pressure"); *cf. Johnson*, 2009-NMSC-049, ¶ 12 (turning to the dictionary definition of the term "employee" to glean its "ordinary meaning"). Thus, the ordinary definitions of the terms "explosion," "explode," and "exploding" could be construed to cover a dry ice bomb. Nevertheless, examining the foregoing meanings does not end our inquiry in this

5

case.

**{16}** We will not rely upon the literal meaning of the words chosen by the Legislature "when such an application would be absurd, unreasonable, or otherwise inappropriate." *Rivera*, 2004-NMSC-001, ¶ 13. To read Section 30-7-18(B)(2) in the manner advocated by the State would lead to an absurd result. As indicated earlier in this Opinion, a dry ice bomb is not "explosive" as defined in Section 30-7-18(A). Thus, to rely exclusively on the plain meaning of "explosion" to conclude that a dry ice bomb fits within Subsection (B)(2) would be to conclude that the device at issue, though not explosive, is nevertheless an "explosive device."

**{17}** Moreover, we reject the State's suggestion that Section 30-7-18(B)(2) may be read without reference to Section 30-7-18(A). "[A] statutory subsection may not be considered in a vacuum, but must be considered in reference to the statute as a whole[.]" *Rivera*, 2004-NMSC-001, ¶ 13 (internal quotation marks and citation omitted). Reading Sections 30-7-18(A) and 30-7-18(B) in reference to one another as parts of a "harmonious" whole, we cannot conclude that the Legislature intended the definition of "explosive device" to be considered wholly unrelated to its definition of "explosive." *See Rivera*, 2004-NMSC-001, ¶ 13 ("[W]henever possible . . . we must read different legislative enactments as harmonious instead of as contradicting one another." (omission in original) (internal quotation marks and citation omitted)). Had the Legislature intended to omit the concept or the definition of "explosive" from Section 30-7-18(B), it could have chosen different language. That the Legislature chose to modify "device" in Section 30-7-18(B) with the earlier defined term, "explosive," cannot be ignored. *See Jackson*, 2010-NMSC-032, ¶ 28 ("It is fundamental that a statute should be so construed that no word, clause, sentence provision[,] or part thereof shall be rendered surplusage or superfluous." (internal quotation marks and citation omitted)).

**{18}** Similarly, viewed in the context of Section 30-7-18 as a whole, it is rational to conclude that the term "explosion" in Subsection (B)(2) was intended to be construed as a derivative of or in relationship to the term "explosive." That is, in addition to the dictionary definitions of "explosion" provided earlier, the term "explosion" might also be used in ordinary parlance to describe what occurs as a result of the combustion of an explosive device. Thus, viewed in context of the statute and section as a whole, we do not believe that Subsection (B)(2) encompasses a dry ice bomb.

**{19}** We are not persuaded by the State's additional arguments or authority regarding the scope of Section 30-7-18. The State argues that we should follow the lead of the Ohio Court of Appeals which determined, in two separate cases, that a bottle bomb was an "explosive device," but that it was not an "explosive." *See State v. Dommer*, 162 Ohio App. 3d 404, 2005-Ohio-4073, 833 N.E.2d 796, at ¶ 12 (concluding that a bottle bomb "was not an 'explosive' as defined" by the Ohio Revised Code); *In re Travis*, 675 N.E.2d 36, 37-40 (Ohio Ct. App. 1996) (concluding that a bottle bomb was an explosive device under the Ohio Revised Code). In concluding that a bottle bomb was an explosive device, the *Travis* court

6

interpreted a statutory definition of such a device that differed significantly from the definitions provided in Section 30-7-18(B). In relevant part, the Ohio Revised Code defined "explosive device" as a "device designed or specially adapted to cause physical harm to persons or property by means of an explosion" and it included "any pressure vessel which has been knowingly tampered with or arranged so as to explode." *Travis*, 675 N.E.2d at 39 (internal quotation marks and citation omitted). Thus, the Ohio statute at issue in *Travis* was broader than Section 30-7-18(B), and its applicability depended, in part, on the purpose of the device. Owing to the lack of similarity between the Ohio statute and Section 30-7-18(B), *Travis* does not provide persuasive authority for the State's argument. Additionally, the State warns against the danger of a ejusdem generis analysis in this case by arguing that limiting the definitions of Section 30-7-18 to "reactions caused by burning or fire" cannot have been the Legislature's intent because, under that interpretation, "the possession of atomic bombs" would be legal under Section 30-7-19.1. We do not find this line of reasoning persuasive. We do not believe that the New Mexico Legislature intended the Explosives Act to cover the "possession" of atomic weaponry. It is unlikely that possession of an atomic bomb would be the subject of a state-level prosecution. Atomic energy is the purview of the federal government. *See* 42 U.S.C.A. § 2271(c) (West 2013) (stating that the Attorney General of the United States has the exclusive authority to bring any action against any individual or person for a violation of the Atomic Energy Act).

**{20}** The State also argues that the Legislature did not need to include specific language about dry ice bombs in the Explosives Act to indicate that such a device was prohibited. The appellate courts recognize that, when drafting a statute, the Legislature cannot predict all of its possible applications. *Cf. Martinez v. Pub. Emps. Ret. Ass'n of N.M.*, 2012-NMCA-096, ¶ 11, 286 P.3d 613 (recognizing that "legislatures cannot predict all possible applications when drafting a statute" (internal quotation marks and citation omitted), *cert. quashed*, 2013-NMCERT-003, ___ P.3d ___ (No. 33,759). It is for that reason that we rely on principles of statutory construction. And as earlier indicated in this Opinion, we do not believe that dry ice bombs fall within the definitions provided in Section 30-7-18.

**{21}** Further, the State argues that the Legislature was not alerted to the need to specifically include dry ice bombs within the purview of the Explosives Act because, at the time that the statute was drafted, other state legislatures had yet to expressly prohibit such devices. We see no rational basis for this argument. The Legislature is free to draft and to amend statutes as it sees fit. Dry ice bombs are not a new concept. *See e.g.*, *Rataj*, 73 F.2d at 184-85 (describing, in 1934, the makings of what would be considered a dry ice bomb today). Nor do we believe that our Legislature would depend upon statutory amendments from other states to alert them to the concept or to the danger of such devices. We have concluded that the Legislature did not intend to include dry ice bombs within the purview of the Explosives Act. *Cf. Muqqddin*, 2012-NMSC-029, ¶ 37 (declining to expand the statutory definition of "prohibited space," as that term is used in the burglary statute, absent the Legislature's clear intent to do so).

**CONCLUSION**

7

**{22}** For the foregoing reasons, we affirm the district court's dismissal of the charge against Defendant for possession of an explosive or incendiary device.

**{23}** **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**M. MONICA ZAMORA, Judge**

**Topic Index for** _State v. Alverson_**, No. 32,046**

**APPEAL AND ERROR**
Standard of Review

**CRIMINAL LAW**
Explosive Device

**CRIMINAL PROCEDURE**
Dismissal of Charges

**STATUTES**
Interpretation
Legislative Intent
Rules of Construction