[Cite as *In re B.J.*, 2014-Ohio-5701.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

IN THE MATTER OF: B.J.,            :        **O P I N I O N**
DELINQUENT CHILD.

                                   :        **CASE NO. 2013-L-091**

Appeal from the Lake County Court of Common Pleas, Juvenile Division.
Case No. 2013 DL 00998.

Judgment: Affirmed in part, reversed and vacated in part.

*Charles E. Coulson*, Lake County Prosecutor, and *Karen A. Sheppert*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Appellee State of Ohio).

*Neil R. Wilson*, Neil R. Wilson Co., L.P.A., FirstMerit Bank Building, 56 Liberty Street, Suite 205, Painesville, OH 44077 (For Appellant B.J., a minor).

TIMOTHY P. CANNON, P.J.

{¶1} Appellant, B.J., a minor, appeals an adjudication of delinquency by the Lake County Court of Common Pleas, Juvenile Division, for unlawful possession of a dangerous ordnance, illegal manufacture or processing of explosives, and complicity to criminal mischief. We find appellant's second assignment of error with merit to the extent discussed below and reverse the finding of "true" by the trial court on those counts.

{¶2} On August 12, 2013, an amended complaint was filed against appellant alleging seven counts of delinquency. The complaint alleged that appellant committed certain acts that, had he been an adult, would have constituted the following offenses:

Count One - Unlawful Possession of a Dangerous Ordnance in violation of R.C. 2923.17(A);

Count Two - Illegal Manufacture or Processing of Explosives in violation of R.C. 2923.17(B);

Count Three - Complicity to Unlawful Possession of Dangerous Ordnance in violation of R.C. 2923.03(A)(2);

Count Four - Complicity to Illegal Manufacture or Processing of Explosive in violation of R.C. 2923.03(A)(2);

Count Five - Complicity to Criminal Mischief in violation of R.C. 2923.03(A)(2);

Count Six - Complicity to Criminal Mischief in violation of R.C. 2923.03(A)(2); and

Count Seven - Disorderly Conduct in violation of R.C. 2917.11(A)(1).

{¶3} Appellant entered a plea of "not true" to Counts One through Six. Appellant pled no contest to Count Seven, disorderly conduct.

{¶4} On August 16, 2013, a suppression hearing was held at which appellant sought to have his interview with Matthew Gosnik, an officer with the Madison Township Police Department, suppressed. At the hearing, the court heard the testimony of Officer Gosnik and of appellant's father. The court then overruled the motion to suppress, finding that appellant was not in police custody and that the questioning was a "consensual conversation."

{¶5} Immediately after the suppression hearing, a trial was held. At trial, the state called the following as witnesses: Officer Matthew Gosnik; David Green, a

2

criminalist at the Lake County Crime Laboratory; and the three other juveniles involved in the March 9, 2013 incidents. The defense did not call any witnesses. The court found the complaint "true" as to Count One, unlawful possession of a dangerous ordnance; Count Two, illegal manufacture or processing of explosives; and Count Five, complicity to criminal mischief. The court found the complaint "not true" as to Count Three, Count Four, and Count Six.

{¶6} The court ordered appellant to a minimum of six months in the legal custody of Ohio Department of Youth Services ("DYS") and a maximum period not to exceed appellant attaining the age of 21 on Count One; a minimum of one year in the legal custody of Ohio DYS and a maximum period not to exceed appellant attaining the age of 21 on Count Two; and 90 days in the Lake County Juvenile Detention Facility on Count Five. The commitment of appellant to both Ohio DYS and the Lake County Juvenile Detention Facility was suspended on the condition that appellant "follows rules of Court and laws of the State of Ohio."

{¶7} The facts adduced at trial are relatively undisputed. During the afternoon of March 9, 2013, three other juveniles went to the Wal-Mart on North Ridge Road and purchased the materials necessary to create a "Works Bomb."[1] A Works Bomb is typically assembled using three common household products—an empty plastic soda bottle, toilet bowl cleaner, and aluminum foil. First, aluminum foil is inserted into an

---

1. Works Bombs are evidently extremely popular. Indeed, the growing prevalence of Works Bombs has been reported by groups as diverse as the CDC, NPR, Slate, and the UK Daily Mail (which reported an 18-year-old Utah beauty pageant queen was forced to return her crown after an indictment on charges similar to those in this case). Daily Mail Reporter, *Beauty Queen Accused of Throwing Homemade Explosives Agrees to Plea Deal* (Sept. 26, 2013), available at http://www.dailymail.co.uk/news/article-2434079/Kendra-Gill-Utah-Beauty-queen-accused-throwing-homemade-explosives-agrees-plea-deal.html. A search for "Works Bomb" on YouTube.com returns nearly a quarter-million videos of backyard bomb builders.

empty plastic bottle. Next, toilet bowl cleaner is added, and the bottle is sealed by screwing on the cap. Once sealed, the chemical reaction between the aluminum foil and the toilet bowl cleaner releases gases. This causes the pressure in the bottle to build until it exceeds what the bottle can withstand. At this point, the bottle explodes.

{¶8} After purchasing their necessary supplies, the three juveniles returned to one of their homes. Sometime shortly thereafter, appellant joined the other juveniles. The four juveniles rolled aluminum foil into balls, thereby beginning the process of assembling the Works Bombs. Appellant participated in rolling several pieces of foil into balls.

{¶9} At around eight or nine o'clock that evening, the four boys drove in one of the juvenile's trucks to Wood Road. Once at Wood Road, one of the juveniles added toilet bowl cleaner to one of the plastic bottles that contained aluminum foil. The bottle was then sealed with a cap and thrown into an open field. The four juveniles waited in the vehicle for the Works Bomb to explode. Once the Works Bomb exploded, the juveniles drove away.

{¶10} The juveniles set off additional Works Bombs that evening, including one on Townline Road and one on Hazel Road, which were thrown into the front yards of occupied homes. No evidence was presented at trial that any of the Works Bombs discharged that evening caused any personal injury or property damage. Indeed, none of the incidents that evening were reported to the police. Police began investigating the March 9, 2013 incidents when investigating another string of Works Bomb explosions that did not implicate or otherwise involve appellant.

{¶11} On March 25, 2013, Officer Matthew Gosnik from the Madison Township Police Department contacted appellant's father upon learning that appellant may have been involved in the March 9, 2013 incidents. Appellant's father arranged to bring appellant to the police department for questioning later that day.

{¶12} Appellant's father drove appellant to the police station to be interviewed. Officer Gosnik, who was in full uniform, escorted appellant and his father to an interview room at the station. Once in the interview room, Officer Gosnik decided not to inform appellant of his *Miranda* rights. Officer Gosnik testified at the suppression hearing that he did not read appellant his *Miranda* rights because he did not think he was conducting a custodial interrogation.

{¶13} During the course of the interview, appellant confessed to having rolled up pieces of aluminum foil to be used in the Works Bombs as well as being in the truck when the three other juveniles threw the Works Bombs. Appellant made a written statement consistent with his verbal confession.

{¶14} Appellant timely appeals the adjudication of delinquency, raising two assignments of error. Appellant's first assignment of error states:

{¶15} "The trial court erred when it failed to grant the motion of the appellant to suppress statements made to a police officer while he was in custody and had not been given his *Miranda* warnings."

{¶16} Under this assignment of error, appellant argues that his statement made to police should have been suppressed because appellant did not come to the police station voluntarily, was not advised of his right to remain silent, and was subject to coercive pressure to confess.

5

{¶17} The requirement that police administer *Miranda* warnings is triggered only when interrogations are custodial in nature. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, ¶47 (citation omitted). Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

{¶18} In determining whether an individual is in custody for the purposes of *Miranda*, the court considers "the circumstances surrounding the interrogation" and whether, under those circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). A non-custodial interrogation becomes custodial when there is a "formal arrest or restraint on freedom of movement" similar to that of a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (citation omitted). A determination of whether an interrogation is custodial or non-custodial depends on the objective circumstances of the interrogation, not the subjective views held by either the officer or the person being questioned. *Stansbury v. California*, 511 U.S. 318, 323 (1994).

{¶19} In the present case, we recognize there are factors weighing both for and against a finding that the interview was custodial. Weighing against a finding that the interview was custodial is the fact that B.J. was told he did not need to talk. However, appellant was also told that "he didn't want to be the only guy not telling the truth." The fact that the interview took place in a police interview room, at a station to which appellant was brought by his father, weighs in favor of a finding that the interview was custodial. Officer Gosnik told appellant that he faced "consequences" for his actions.

6

At the suppression hearing, Officer Gosnik testified that by "consequences" he meant that appellant would be charged in the juvenile system. However, appellant's father was also present in the interview room. This factor weighs against a finding that the interview was custodial. *See In re C.M.*, 8th Dist. Cuyahoga No. 99599, 2013-Ohio-5426, ¶42-44. In addition to being present in the room, appellant's father was insistent that appellant give a statement to the officer about the incidents in question. The interview was of a short duration, lasting less than 30 minutes. Finally, B.J.'s age weighs against a finding that the interview was custodial. At the time of the interview, B.J was 17 years old and, by all accounts, a mature and intelligent individual.

{¶20} Weighing all the circumstances surrounding appellant's interrogation, we find that appellant was not in custody at the time of his confession.

{¶21} Appellant's first assignment of error is without merit.

{¶22} In his second assignment of error, appellant states:

{¶23} "The trial court erred when it made findings of true to counts 1, 2, 5, and 7, where there was no evidence or insufficient evidence to arrive at a finding of true."

{¶24} Under this assignment of error, appellant challenges the sufficiency of the evidence supporting the findings of "true."

{¶25} The standard of review applied in determining whether a juvenile court's finding of delinquency is supported by sufficient evidence is the same standard applied in adult criminal convictions. *In re J.A.S.*, 12th Dist. Warren No. CA2007-04-046, 2007-Ohio-6746, ¶11.

{¶26} When measuring the sufficiency of the evidence, an appellate court "must consider whether the state set forth enough adequate evidence to sustain the jury's

verdict as a matter of law." *Kent v. Kinsey*, 11th Dist. Portage No. 2003-P-0056, 2004-Ohio-4699, ¶11, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A verdict is supported by sufficient evidence when, after viewing the evidence most strongly in favor of the prosecution, there is substantial evidence upon which a jury could reasonably conclude that the state proved all elements of the offense beyond a reasonable doubt. *State v. Schaffer*, 127 Ohio App.3d 501, 503 (11th Dist.1998), citing *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14-15 (Dec. 23, 1994).

{¶27} Under Count One, appellant was charged with unlawful possession of a dangerous ordnance in violation of R.C. 2923.17(A). R.C. 2923.17(A) states: "[n]o person shall knowingly acquire, have, carry, or use any dangerous ordnance." Appellant's sufficiency of the evidence challenge requires us to closely examine the revised code sections related to the regulation of dangerous ordnances.

{¶28} As it applies in R.C. 2923.17, "dangerous ordnance" means "[a]ny explosive device or incendiary device[.]" R.C. 2923.11(K)(2). Furthermore, an "explosive device" is "any device designed or specially adapted to cause physical harm to persons or property by means of an explosion, and consisting of an explosive substance or agency and a means to detonate it." R.C. 2923.11(H). The definition of "explosive device" includes, without limitation, "any bomb, any explosive demolition device, any blasting cap or detonator containing an explosive charge, and any pressure vessel that has been knowingly tampered with or arranged so as to explode." *Id.*

{¶29} R.C. 2923.11(L)(6) also provides a number of exclusions as to what constitutes a "dangerous ordnance." Specifically, "dangerous ordnance" does not include "[a]ny device that is expressly excepted from the definition of a destructive

8

device pursuant to the 'Gun Control Act of 1968,' 82 Stat. 1213, 18 U.S.C. 921(a)(4), as amended, and regulations issued under that act." *Id.* The Gun Control Act specifically excludes any device that is not designed or redesigned for use as a weapon. 18 U.S.C. 921(a)(4).

**{¶30}** Accordingly, to prove that appellant possessed a "dangerous ordnance," the state must prove three elements. The device must "(1) be comprised of an explosive substance or agency; (2) have a means to detonate; and (3) be 'designed or specifically adapted' to cause physical harm to persons or property." *In re S.R.*, 182 Ohio App.3d 803, 2009-Ohio-3156, ¶22 (12th Dist.), citing R.C. 2923.11(H).

**{¶31}** In this case, the state failed to prove that the Works Bombs in question were "designed or specifically adapted" to cause physical harm to persons or property. Accordingly, the finding of "true" for possession of a dangerous ordnance in violation of R.C. 2923.17(A) is not supported by the evidence.

**{¶32}** Our conclusion that a Works Bomb does not constitute a dangerous ordnance is based on the specific, undisputed facts of this case. Here, appellant and three other juveniles discharged multiple Works Bombs; however, the evidence does not establish that any of them were discharged in a way "designed or specifically adapted" to cause physical harm to persons or property. At least one Works Bomb was discharged in an open field, while two others were discharged in residential neighborhoods mere feet off the road. No individuals or structures were in close proximity to the locations where the Works Bombs were discharged. Had the Works Bombs been discharged in a manner that caused or created a substantial risk of

9

causing harm to persons or property, the court may have concluded it was consistent with use as a weapon. However, there is no such evidence in the record of this case.

{¶33} Our conclusion that a Works Bomb does not constitute a dangerous ordnance when it is discharged in an area devoid of people or structures is consistent with that reached by the Twelfth Appellate District when deciding the issue under very similar facts. The Twelfth District stated a Works Bomb is not a dangerous ordnance when it is "neither used as a weapon nor 'designed or specifically adapted' to cause damage to persons or property." *In re S.R.*, *supra*, at ¶35. In that case, the "[a]ppellant went to a remote location, constructing the device on a grassy area near the parking lot at a vacant pool complex. Moreover, no actual damage resulted from the detonation of the bomb." *Id.* Similarly in this case, the group of juveniles discharged the Works Bombs in areas away from where they could cause any physical harm to persons or property.

{¶34} The conclusion reached by this court and the Twelfth District departs from the one reached by the Tenth Appellate District. The Tenth District held that a Works Bomb constituted a "dangerous ordnance" when it was discharged in a public park because it "can cause physical harm to persons or property." *In re Travis*, 110 Ohio App.3d 684, 690 (10th Dist.1996). The Twelfth District, in distinguishing *In re S.R.* from *In re Travis*, stated that "the Tenth Appellate District disregarded the actual elements of the offense. Instead, the court focused upon the capability of bottle bombs, the general notion that detonating a bottle bomb is 'wrong,' * * * rather than examine whether the bomb was 'designed or specifically adapted' to cause damage[.]" *In re S.R., supra*, at ¶38. Specifically, in *In re Travis*, the court did not consider whether the device in

10

question was "designed or specifically adapted" to cause physical harm to persons or property.

{¶35} We agree with the conclusion reached by the Twelfth District in *In re S.R.*, that when a Works Bomb is not designed or specifically adapted to cause damage, it does not fit within the statutory definition of "dangerous ordnance." As statutory definitions and penalties must be "strictly construed against the state, and liberally construed in favor of the accused," pursuant to R.C. 2901.04(A), this is the only reasonable conclusion. Accordingly, the trial court's finding of "true" on Count One is not supported by sufficient evidence.

{¶36} Under Count Two, appellant was charged with illegal manufacture or processing of explosives in violation of R.C. 2923.17(B). R.C. 2923.17(B) states, "[n]o person shall manufacture or process an explosive at any location in this state * * *." R.C. 2923.11(M) defines "explosive" as:

> [A]ny chemical compound, mixture, or device, the primary or common purpose of which is to function by explosion. 'Explosive' includes all materials that have been classified as division 1.1, division 1.2, division 1.3, or division 1.4 explosives by the United States department of transportation in its regulations and includes, but is not limited to, dynamite, black powder, pellet powders, initiating explosives, blasting caps, electric blasting caps, safety fuses, fuse igniters, squibs, cordeau detonant fuses, instantaneous fuses, and igniter cords and igniters.

{¶37} We initially note the Ohio Legislature made changes to the Ohio Revised Code in 2008 that greatly broadened the definition of what constitutes an explosive. Prior to that amendment, the term "explosive" did not include any explosive that was not subject to regulation under the rules of the fire marshal. The amended definition of explosive seems to include, without limit, everything that may function by explosion.

11

{¶38} In this case, appellant limits his challenge to the sufficiency of the evidence and does not challenge the breadth of the definition of explosive in R.C. 2923.11(M). Therefore, so long as the state set forth adequate evidence to sustain the jury's verdict as a matter of law, the trial court's finding of "true" as to Count Two must be upheld.

{¶39} The Works Bombs fit within the definition of explosive in R.C. 2923.11. A Works Bomb is a mixture that, when brought together, functions to explode. Appellant directs us to several cases where Works Bombs were held not to constitute "explosives." *See State v. Dommer*, 162 Ohio App.3d 404, 406 (5th Dist.2005); *State v. Young*, 5th Dist. Stark No. 2005CA00009, 2005-Ohio-3925, ¶11. However, these cases were decided before R.C. 2923.11(M) was amended. The prior version of the statute contained the following provision: "'[e]xplosive' does not include * * * any explosive that is not subject to regulation under the rules of the fire marshal." That portion of the statute was relied upon by the Fifth District when it made its decisions in *Dommer* and *Young*; however, it was removed from the statute in 2008. Based on the new version of the statute, the Works Bombs at issue here fall within the R.C. 2923.11(M) definition of explosive, which essentially includes any device, "the primary or common purpose of which is to function by explosion."

{¶40} Furthermore, sufficient evidence was presented at trial to find that appellant "manufacture[d] or process[ed]" an explosive. Neither term is defined in R.C. 2923.11. Undefined language must be construed according to its ordinary and common usage. *See* R.C. 1.42. Here, appellant participated in the assembly and manufacture of the Works Bombs. There was testimony by the other participants regarding

12

appellant's involvement. In addition, appellant told Officer Gosnik that he rolled aluminum foil and put it in the bottles. Appellant's statements to Officer Gosnik are sufficient to show that appellant engaged in the manufacture of the Works Bombs.

{¶41} We acknowledge that under the various definitions in R.C. 2923.11, we are forced to the seemingly inconsistent conclusion that the Works Bombs, as used in this case, fit within the definition of "explosive" but not within that of either "explosive device" or "dangerous ordnance." However, we must assume the legislature had good reason to define each of these terms separately and differently. As a result, the trial court's finding of "true" on Count Two is supported on the record by sufficient evidence.

{¶42} Under Count Five, appellant is charged with complicity to unlawful possession of a dangerous ordnance in violation of R.C. 2923.03(A)(2). R.C. 2923.03(A)(2) states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]"

{¶43} We have previously determined insufficient evidence was presented to find appellant committed the offense of Count One, unlawful possession of a dangerous ordnance. Having found the evidence failed to establish that a predicate offense was committed, the delinquency finding for complicity to the underlying offense must also be based on insufficient evidence. *See* R.C. 2923.03(C).

{¶44} Appellant's assignment of error also challenges the sufficiency of the evidence with respect to Count Seven, disorderly conduct. However, appellant entered a plea of no contest to this charge. A plea of no contest is an admission of the truth of the facts alleged in the complaint. Crim.R. 11(B)(2). There is no record of the plea

hearing that resulted in the finding of "true" to this offense. Therefore, we have no basis upon which to vacate the finding of "true" to Count Seven.

{¶45} Appellant's second assignment of error is well taken to the extent discussed above. As the judgment of the Lake County Court of Common Pleas, Juvenile Division, finding appellant delinquent on Counts One and Five is not supported by the evidence, appellant's delinquency on those two counts is reversed and vacated.

CYNTHIA WESTCOTT RICE, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion,

COLLEEN MARY O'TOOLE, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion.

_____

CYNTHIA WESTCOTT RICE, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion.

{¶46} I agree with the majority's disposition and rationale of appellant's first assignment of error. I also agree with the majority's disposition and rationale of the second assignment of error as they relate to Counts Two, and Five. I do not, however, agree with the majority's disposition of Count One. In this regard, I respectfully dissent.

{¶47} As the majority notes, the state was required to establish, beyond a reasonable doubt, that appellant possessed a "dangerous ordnance" to adjudicate him delinquent for violating R.C. 2923.17(A). To establish that an object is an "explosive device" and, therefore a "dangerous ordnance," the state must prove the device was (1) comprised of an explosive substance; (2) was capable of detonating; and (3) "designed or specifically adapted" to cause physical harm to persons or property. *In re S.R.*, 182

14

Ohio App.3d 803, 2009-Ohio-3156 (12th Dist.); *see also* R.C. 2923.11(H). The majority concludes the evidence failed to establish the devices were "designed or specifically adapted" to cause harm because they were detonated at locations where no persons or property were located. It is factually true that the devices were detonated at locations where no persons or property could have been harmed. The inquiry, however, cannot end with this acknowledgement. Instead, given the evidence, I would hold the record supports the conclusion that the devices were specifically adapted to cause physical harm.

{¶48} The third element of "explosive device" requires a factual analysis of whether the particular device in question was "designed *or* specifically adapted" to cause damage. It does not necessarily require an analysis of the specific intent or destructive purpose of the individual(s) charged with creating or possessing the object. An empty two-liter plastic bottle of soda will not, by itself, explode. When toilet cleaner and aluminum foil are added and the bottle is shaken, the bottle has become specifically adapted to explode. Furthermore, the state's expert, David A. Green, testified that he had created Works bombs and such bombs are capable of generating tremendous pressure that can cause damage to person or property within a five- to six-foot range of the explosion. Viewing the facts as a whole, therefore, the bottles that became the vehicles for the bombs were, at the very least, specifically adapted to cause physical harm to persons or property.

{¶49} The majority's conclusion focuses upon the remoteness or unpopulated nature of the location where the devices were discharged. In doing so, it appears the majority emphasizes the element of "design." Conceptually, the element of "design" not

only implicates the bomb-builder's manner of construction, but also his or her particular purpose; namely, whether, in constructing the device, he or she had the intent or purpose to physically harm persons or property. In this respect, I agree that, given the locations where the bombs were detonated in this case, it was not the builders' "design" to cause physical harm to persons or property.

{¶50} In this case, however, there were facts to support the conclusion that the plastic bottles were specifically adapted in such a way to cause physical harm, regardless of the bomb-builders' end, purpose, or goal. Because the third element is disjunctive, I would hold that sufficient evidence was produced to support the conclusion that the plastic soda bottles were specifically adapted to detonate, explode and, as a result, cause physical harm to persons or property. There was therefore adequate evidence to support the conclusion the Works bombs in this case were dangerous ordnances.

_____

COLLEEN MARY O'TOOLE, J., concurs in part and dissents in part, with a Concurring and Dissenting Opinion.

{¶51} I concur with the majority's well-reasoned disposition of the second assignment of error. However, as I find the interrogation of B.J. was custodial, and he was not given *Miranda* warnings, I would reverse and remand based on the first assignment of error.

{¶52} The police differentiate between an "interview," and an "interrogation." The purposes of an interview are to "[o]btain relevant information about the situation or crime"; [e]stablish rapport with the subject"; and "to gather information and determine

16

facts."  Ohio Peace Officer Training Commission, Education & Policy Section, *Peace Officer Basic Training, Interview & Interrogation, Unit 11 – Topic 15*, at 10 (Jan. 1, 2014) (hereinafter, "*Peace Officer Basic Training.*")  It "generally has a non-accusatory tone." *Id.*

**{¶53}**  By contrast, an interrogation is used not merely to gather information relevant to an investigation, but to "establish innocence," or to obtain information leading "to a *confession or an admission.*"  *Peace Officer Basic Training* at 13.  (Emphasis added.)  In this case, five boys were suspects.  B.J was the fourth interviewed – Officer Gosnik already knew the course of events from the prior interrogations.  The *only* and *obvious* purpose of speaking to B.J. was to elicit a confession, and his part in the offenses.

**{¶54}**  There are numerous recommended techniques for the police to use in conducting interrogations.  *Peace Officer Basic Training* at 22-28.  Several appear in this case.  For "[m]ultiple subject interrogations," the manual recommends: (1) splitting "the subjects into separate rooms"; (2) advising "one suspect the other is blaming him/her for everything"; and (3) using "each suspect's statement against each other as discrepancies are discovered."  *Id.* at 26.  Here, each boy was interviewed separately; Officer Gosnik specifically advised B.J. that he did not want to be the only boy not giving his version of the events; and, each boy was questioned regarding differences in their versions of events.  The last advice given for interrogations in *Police Officer Basic Training* is for the interrogator to "[p]oint out advantages of confessing/giving relevant information and disadvantages of not."  *Id.* at 28.  Again, the statement that B.J. did not want to be the only boy not giving his version of events served this purpose.

17

{¶55} B.J. was clearly subjected to an interrogation, meant to elicit a confession, using recommended techniques for achieving this result. The only question remaining is whether the interrogation was custodial – i.e., whether a reasonable person would feel free to stop the interrogation, and leave. *Thompson*, *supra*, at 112. For purposes of *Miranda*, "A court must look at the totality of the circumstances in order to determine whether an individual is in custody at any given time." *State v. Tate*, 7th Dist. Mahoning No. 07 MA 130, 2008-Ohio-3245, ¶44, citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

{¶56} Having reviewed the interrogation of B.J., I conclude, under the totality of the circumstances, he would not have felt free to leave, or discontinue it. As the majority notes, the fact it was conducted at the police station, and that Officer Gosnik told B.J. he did not want to be the only boy involved who did not confess, tend to show the interview was custodial.

{¶57} The majority observes the interrogation was conducted with B.J.'s father present, and that the courts of Ohio have said this militates against a finding that an interrogation of a juvenile was custodial. I agree. However, as the majority further notes, B.J.'s father was insistent his son tell Officer Gosnik exactly what had occurred, essentially compelling B.J. to confess. Further, B.J's father was his son's transportation to and from the police station. In effect, B.J.'s father was used to reinforce his son's feeling that he could not stop the interrogation, and leave.

{¶58} It seems clear B.J.'s father did not realize that his son's statements could be used as a confession, and that he was a suspect. Even though he was told he could leave, the carefully engineered environment demonstrated otherwise. *Police Officer*

18

*Basic Training* warns that "psychological coercion" will invalidate a confession. *Id.* at 19. I agree. The entire purpose of *Miranda* is to place the parties – the state and the suspect – in a position where suspects know and understand their rights, and their statements are truly voluntary.

{¶59} It is morally admirable that parents advise their children to be honest about potentially bad acts those children have committed. However, a juvenile's right to counsel, and to refuse to speak to police when under investigation, are constitutional rights pertaining to the juvenile, not his or her parents. The juvenile must be the one to waive these rights, not a parent. While well-intentioned, B.J.'s father was instrumental in the boy's decision to confess. In order to maintain the public trust, the police must be especially mindful that a juvenile and his or her parents make knowing and voluntary decisions when under interrogation, with full knowledge of the juvenile's rights, and the potential consequences. And while in this case, B.J.'s father told Officer Gosnik he doubted the boy had considered the collateral consequences flowing from his actions, I am somewhat dubious anyone other than a lawyer experienced in the juvenile justice system would understand how serious these collateral effects on a child's future opportunities for schooling, job training, and employment can be. Parents are generally not cognizant of these liabilities. Indeed, I must assume that B.J. and his family have finally come to realize this, since there is an appeal at all.

{¶60} A reasonable juvenile in B.J.'s position would not have felt free to leave the interrogation, or terminate it. He was in custody, and should have received his *Miranda* warnings. I respectfully concur and dissent.

19