OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of R.H., a minor child, filed August 17, 2007. On September 9, 2004, R.H. was charged in a delinquency complaint with one count of rape, a felony of the first degree, in violation of R.C. 2907.02(A)(1)(b). On March 30, 2005, R.H. filed a motion to suppress, and on April 8, 2005, following a hearing, the Magistrate overruled the motion. An *Page 2 
adjudicatory hearing was held before the Magistrate, and R.H. was determined to be responsible as charged in the complaint. The trial court later adopted the Magistrate's decision of adjudication and disposition. At the time of the offense, R.H. was 11 years old, and the victim was eight years old. R.H. received a suspended commitment to the Department of Youth Services, a year of probation, and an order to attend sex offender counseling.
 {¶ 2} The events giving rise to this matter began in July, 2004, when R.H., the victim, and two brothers, Ben and Zack, also minors, went for a bike ride. Ben and Zack are the victim's cousins. After stopping at a park, the four continued to the brothers' apartment, where they watched television in a bedroom on a bed. According to the victim, R.H. removed her pants and underwear and put his penis in her vagina against her will, and she told him to stop.
 {¶ 3} The victim's mother, Angela, learned of the incident days later from a juvenile neighbor. Angela asked the neighbor to phone R.H. and discuss the incident with him while Angela listened on another extension. Angela recognized R.H.'s voice and overheard R.H. say that "he had pulled [the victim's] pants down and that she had pulled them back up and he had pulled them back down and that he * * * fucked her."
 {¶ 4} Angela contacted the police, and Detective Darryl Swafford of the Germantown Police Department responded to R.H's home in an unmarked Ford Explorer at around noon. Upon arrival, Swafford, who was not in uniform and is six feet four inches tall, identified himself to R.H.'s mother, Tracy, and informed her that he was there to investigate an allegation of rape. Swafford was wearing a badge on his belt and he was armed with his service revolver, which was visible. As Swafford spoke *Page 3 
to Tracy, R.H. entered the room. Swafford asked R.H. if he knew why Swafford was there, and R.H. responded, "Ben and Zack did it too."
 {¶ 5} Swafford then asked Tracy if he could take R.H. to the police station for questioning. He told Tracy that R.H. was not under arrest, and that he would be free to leave whenever he chose to do so. Swafford did not tell Tracy that she could accompany her son. Swafford told Tracy that he would bring R.H. home. Tracy was in shock and did not believe she had a choice but rather had to let Swafford take R.H. to the station. Swafford then told R.H. that he wanted to talk to him. It is Swafford's preference to conduct interviews at the station, but he later interviewed Ben and Zack in their home in the presence of a parent. Swafford did not tell R.H. that Swafford was going to use anything that R.H. said against him. Swafford did tell Tracy that any information resulting from the interview could possibly be used against R.H.
 {¶ 6} R.H. had no prior experience with the police. Swafford did not pat R.H. down or handcuff him. R.H. rode to the station in the front seat of Swafford's vehicle. Upon arrival, Swafford interviewed R.H. in the "road room," which is lit with fluorescent lighting and has a window. The window blind was closed, however, and Swafford closed the door during the interview. Swafford told R.H. that he was not under arrest, and that if R.H. wanted to stop the interview, Swafford would take him home. Swafford did not have R.H. sign a waiver of his rights. Swafford indicated he did not threaten R.H. Swafford stated that he did not ask R.H. what grade he was in or if he was in any special education classes at school, and he did not ask him if he had any physical condition or impairment that would make it hard for him to sit through an interview. R.H. was in the fifth grade, and his mother testified that she held him back *Page 4 
in the first grade because of a learning disability. R.H. has Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, Bipolar Disorder and low impulse control, and as a result he attends severe behavioral handicapped classes and takes medication.
 {¶ 7} In response to Swafford's questions, R.H. told Swafford that Ben and Zach had sex with the victim, and that R.H. then turned the victim over onto her stomach and had sex with her. R.H. said that Ben told him "that it was enough and to get off of her." Swafford asked R.H. if he put his penis in the victim's vagina, and R.H. said yes. Swafford asked R.H. how he knew what a vagina is, and R.H. responded, "everybody knows what a vagina is." R.H. then told Swafford that he used the bathroom, and when he returned to the bedroom, the victim was in the closet. According to R.H., the victim came out of the closet and started doing a striptease. Then, R.H. said the victim wanted to call her mother to see if she could go back to the park with the boys.
 {¶ 8} After telling Swafford what happened, R.H. told Swafford that he wanted to go home, and Swafford took him home. It was after noon and R.H. had not had lunch. In the course of the interview, R.H. did not ask for a drink, food, his mother, a lawyer or to go the bathroom. Swafford testified that R.H. did not seem confused. At no time did Swafford request a written statement of R.H. Further, Swafford stated that he was with R.H. for 45 minutes to an hour.
 {¶ 9} At the trial, the court heard testimony from the victim, Angela, Swafford, Tracy, Dr. Janelle Pool, a physician who examined the victim at the hospital, Dr. Ellen Buerk, R.H's physician, and Ben and Zack. *Page 5 
 {¶ 10} Dr. Pool's report indicates a null sign for penetration, and she noted a small opening to the left of the victim's urethra. Dr. Pool "was not sure if that could be related to trauma." Dr. Buerk testified as to R.H.'s various diagnoses and treatments. Ben and Zack denied knowledge of and involvement in the rape of the victim.
 {¶ 11} R.H.'s mother testified that R.H. admitted to her that he had sex with the victim. According to Tracy, "what he said he said in a — like he was cool or he was macho. And I told him not to say stuff like that, that you don't say stuff like that, it's not right to say. And he said, it's true, Mom, that this — I did. I had sex."
 {¶ 12} R.H. asserts four assignments of error. His first assignment of error is as follows:
 {¶ 13} "THE TRIAL COURT ERRED WHEN IT OVERRULED THE APPELLANT'S MOTION TO SUPPRESS FINDING THAT R.H. WAS NOT IN CUSTODY EVEN THOUGH HE WAS TAKEN FROM HIS HOME BY POLICE AND INTERROGATED AT THE POLICE STATION."
 {¶ 14} "Pursuant to Civ.R. 53(E)(3), a party who disagrees with a magistrate's proposed decision must file objections to said decision. When reviewing objections to a magistrate's decision, the trial court is not required to follow or accept the findings or recommendations of its magistrate. (Internal citations omitted). In accordance with Civ.R. 53, the trial court must conduct an independent review of the facts and conclusions contained in the magistrate's report and enter its own judgment. (Internal citations omitted). Thus, the trial court's standard of review is de novo." Liebold v. Hiddens, Montgomery App. No. 21487,2007-Ohio-2972.
 {¶ 15} However, for purposes of our review, the determination of whether R.H. *Page 6 
was in police custody presents a mixed question of fact and law. We defer to the court's findings of fact, when articulated, but evaluate de novo whether on those facts, R.H. was in custody. In this case, the facts are largely uncontroverted and the question is a legal one. In deciding whether R.H. was in custody, the only relevant inquiry is how a reasonable person in R.H.'s position would have understood his situation. This determination considers the totality of the circumstances and is informed by the underlying purpose ofMiranda which is to protect individuals from compelled incrimination.Berkemer v. McCarty (1984), 468 U.S. 420, 442, 104 S.Ct. 3138.
 {¶ 16} "It is well established that the police are not required to administer Miranda warnings to every individual they question. (Internal citations omitted). The United States Supreme Court has held that police officers have a duty to advise a suspect of his rights pursuant toMiranda v. Arizona (1966), 384 U.S. 436, 369-73, 86 S.Ct. 1602, 16 L.Ed.2d 694, when their questioning of the suspect rises to the level of custodial interrogation. (Internal citations omitted). A person is `in custody' only if, under the totality of the circumstances, a reasonable person in the same situation would feel that he was not free to leave. (Internal citations omitted). In order for a statement made by the accused to be admitted in evidence, the prosecution must prove that the accused effected a voluntary, knowing, and intelligent waiver of hisFifth Amendment right against self-incrimination. (Internal citations omitted). In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the *Page 7 
existence of physical deprivation or mistreatment; and the existence of threat or inducement. (Internal citations omitted). State v. Wood, Greene App. No. 2006 CA 1, 2007-Ohio-1027.
 {¶ 17} "Because custodial interrogation is inherently coercive, incriminating statements which are the product of such questioning are not admissible unless Miranda warnings precede that questioning. (Internal citation omitted). Those warnings are indispensable in overcoming the pressures of custodial interrogation and insuring that the individual knows he is free to exercise his right to remain silent at that time." State v. Parrish, Montgomery App. No. 21091,2006-Ohio-2677.
 {¶ 18} Regrettably, the Magistrate overruled the motion to suppress orally and did not separately journalize an entry denying the motion. The transcript merely indicates the Magistrate's conclusion that R.H. was not in custody, without providing any rationale or findings of fact and conclusions of law. The Magistrate's Decision and Judge's Order of Disposition does not address the issue of custodial interrogation with any detail either.
 {¶ 19} We recognize the Supreme Court has not definitively ruled on whether a suspect's youth is part of the objective Miranda custody analysis. See Yarborough v. Alvarado (2004), 541 U.S. 652, 668,124 S.Ct. 2140. The State of Ohio relied upon Alvarado in its oral argument to the Magistrate at the conclusion of the suppression hearing. However, the Magistrate acknowledged he was unfamiliar with the case and the Magistrate then proceeded immediately to a determination, R.H. was "not in custody" without elaboration. It is important to note thatAlvarado involved a 17 and a half year old who was brought to the police station by his parents, further it involved a *Page 8 
habeas petition of a state court conviction. It was emphasized inAlvarado that age may be relevant to a custody inquiry, but not in the case of a 17 and a half year old because it is "difficult to expect police to recognize that a suspect is a juvenile when he is close to the age of majority" and "to ascertain what bearing it has on the likelihood that the suspect could feel free to leave." Id. at 669. (O'Connor, J., Concurring). Additionally, as noted by the dissent, "[c]ommon sense, and an understanding of the law's basic purpose in this area are enough to make clear that [the suspect's] age — an objective, widely shared characteristic about which the police plainly knew — is also relevant to the inquiry." Id. at 676. (Breyer, J., joined by Stevens, Souter, Ginsburg, J.J., dissenting).
 {¶ 20} Upon thorough review of all the circumstances surrounding the interrogation of R.H., we conclude that the trial court erred in determining that R.H. was not in custody at the time of the interview at the police station. R.H. was not interviewed at home with his mother but was isolated from her and transported alone to the police station by an armed detective of imposing height. R.H.'s mother felt she had no choice but to let Swafford take R.H. from their home. R.H. was then placed in the "road room" alone with Swafford with the door closed and the blinds drawn. Both Swafford's gun and badge were visible during the interview. While Swafford told R.H. that he could terminate the interview and return home, R.H's control over his presence was clearly limited; at the age of 11, R.H. could not simply leave of his own accord. R.H. was not provided drink or food, or given a break, although he had not eaten. All of these factors suggest a reasonable person in R.H.'s position would not feel free to leave. *Page 9 
 {¶ 21} It is virtually impossible to conclude that a child of such tender years, 11, would appreciate the fact that he was simply free to leave and terminate the interview. This ruling does not exclude the pre-custodial volunteered statement by R.H. that "Zack and Ben did it too." Since a reasonable person in the same situation as R.H. would conclude that he was not free to leave on his own accord and terminate the interview, R.H. was in custody for Miranda purposes, and Swafford should have advised him of his rights. We note the record is devoid of any evidence that R.H. was Mirandized. In fact, Swafford admitted he did not tell R.H. that what he said would be used against him, and Swafford did not have R.H. sign a waiver of his rights. Accordingly, R.H.'s first assignment of error is sustained. R.H.'s second assignment of error is as follows:
 {¶ 22} "THE TRIAL COURT ERRED WHEN IT SUMMARILY OVERRULED APPELLANT'S DUE PROCESS OBJECTIONS TO THE UNREASONABLE DELAY IN PRODUCING THE MAGISTRATE'S FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER THEY HAD BEEN TIMELY REQUESTED. THE LENGTHY DELAY IN PROCEEDINGS DENIED R.H. THE OPPORTUNITY TO ACCESS THE SECOND DISTRICT COURT OF APPEALS CONCERNING HIS CASE IN VIOLATION OF HIS RIGHT TO DUE PROCESS."
 {¶ 23} "The United States Supreme Court has held that `[t]he fundamental requisite of due process of law is the opportunity to be heard.' (Internal citations omitted). The court has also held that: `An elementary and fundamental requirement of due process in any proceeding * * * is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford *Page 10 
them an opportunity to present their objections.' (Internal citations omitted).
 {¶ 24} "Both the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution guarantee due process of law, and thus guarantee `a reasonable opportunity to be heard after a reasonable notice of such hearing.'"Ohio Valley Radiology Assocs., Inc. v. Ohio Valley Hospital Assoc.
(1986), 28 Ohio St.3d 118, 502 N.E.2d 599, 28 O.B.R. 216.
 {¶ 25} The Magistrate's Decision and Judge's Order of Disposition was issued September 21, 2005. In adopting the Magistrate's Decision, the juvenile court provided, "The above Magistrate's Decision is hereby adopted as an Order of this Court. The parties have fourteen (14) days to object to this decision and may request Findings of Fact and Conclusions of Law pursuant to Civil Rule 52 and Montgomery County Juvenile Court Rule 5.11.2." On September 29, 2005, R.H. filed Cursory Objections and a request for Findings of Fact and Conclusions of Law ("Findings") from the Magistrate. On October 12, 2005, the trial court ordered the Magistrate to file Findings within 14 days after receipt of the transcript. On May 4, 2006, R.H. filed "Juvenile's Initial Objections and Request for Findings of Fact and Conclusions of Law." On May 23, 2006, R.H. filed a Request for Extension of Time to File Supplemental Objections, asking the court for an extension of 14 days after receipt of the Magistrate's Findings. Also on May 23, the Judge's Interim Order was issued, ordering R.H. to file specific objections and prepare proposed Findings within 28 days, and granting the State an additional 10 days to respond to their objections and file proposed Findings. The Court vacated its October 12, 2005 order and ordered the Magistrate to file Findings within 14 days of receipt of the parties' proposed Findings. *Page 11 
On June 19, 2006, R.H. filed proposed Findings. On March 9, 2007, R.H. filed another motion requesting Findings from the Magistrate. On May 4, 2007, the Magistrate's Findings were filed. On May 18, 2007, R.H. filed Specific Objections to Magistrate's Decision, which were overruled by the juvenile judge on July 19, 2007.
 {¶ 26} The trial court's decision overruling R.H.'s objections simply provides, "the Court OVERRULES the youth's objection to the delay in proceedings at the objection phase of adjudication."
 {¶ 27} R.H. argues that the delay in obtaining the Magistrate's Findings "compromised [his] right to due process of law." The State relies upon In re Davis (1999), 84 Ohio St.3d 520, 705 N.E.2d 1219,1999-Ohio-419, for the proposition that "appellant could have forced the court to act by seeking a writ of procedendo. By failing to do so, the juvenile was barred from claiming he was prejudiced."
 {¶ 28} The issue in Davis was whether or not "the seven-day limit within which a juvenile court must enter its disposition of a child adjudicated as abused, neglected or dependent under R.C. 2151.35 also applies to motions filed by an agency under R.C. 2151.414." The Court determined that the seven-day limit applied but "that it is directory, not mandatory." The court also determined that a party "may seek to enforce the statutory time requirement through a writ of procedendo." "A petition for a writ of procedendo `is appropriate when a court has either refused to render a judgment or has unnecessarily delayed proceeding to judgment.'" (Internal citation omitted). Id. As inDavis, R.H. could have filed a writ of procedendo to remedy the delay, but he failed to do so.
 {¶ 29} However, the court contributed to the confusion of the procedural issues *Page 12 
in this matter by citing to Civ.R. 52 in its order of September 21, 2005. Civ.R. 52 has no application to proceedings in the Juvenile Court. Juv.R. 1(A) provides that the Rules of Juvenile Procedure "prescribe the procedure to be followed in all juvenile courts of the state in all proceedings" except those identified in paragraph (C), which have no application in this case and it is Juv.R. 40 which governs proceedings before magistrates.
 {¶ 30} We note that the court may have also exacerbated the delay by the order of October 12, 2005, which directed the magistrate to file findings of fact and conclusions of law without proposed findings and conclusions having first been filed by R.H. By doing this, the court ignored its own rule, Mont. Loc. Juv.R. 5.11.2 which required R.H. to prepare and file proposed findings and conclusions within seven days of the date on which the magistrate's decision is filed.
 {¶ 31} In conclusion, although the delay was lengthy, R.H. suffered no prejudice (he was not detained) and no due process violation has been established. Accordingly, R.H.'s second assignment of error is overruled.
 {¶ 32} R.H.'s third assignment of error is as follows:
 {¶ 33} "THE TRIAL COURT ERRED WHEN IT OVERRULED THE APPELLANT'S OBJECTIONS, FINDING INSTEAD THAT DISMISSAL OF THE CASE UNDER JUVENILE RULES 9 AND 29 WOULD NOT BE IN THE BEST INTEREST OF THE CHILD EVEN THOUGH R.H. WAS 11 AT THE TIME OF THE INCIDENT AND WAS A PARTICIPANT ALONG WITH OTHERS WHO WERE NOT PROSECUTED."
 {¶ 34} Juv.R. 9 provides as follows:
 {¶ 35} "(A) Court action to be avoided *Page 13 
 {¶ 36} "In all appropriate cases formal court action should be avoided and other community resources utilized to ameliorate situations brought to the attention of the court.
 {¶ 37} "(B) Screening; referral
 {¶ 38} "Information that a child is within the court's jurisdiction may be informally screened prior to the filing of a complaint to determine whether the filing of a complaint is in the best interest of the child and the public."
 {¶ 39} "It is clear from the language of Juv.R. 9 that formal court action is permissible in appropriate cases, and that it is within the discretion of the juvenile court to proceed in such a manner." In reCorcoran (1990), 68 Ohio App.3d 213, 587 N.E.2d 957.
 {¶ 40} Juv.R. 29(F)(2)(d) provides as follows:
 {¶ 41} "Upon determination of the issues, the court shall do one of the following:
 {¶ 42} "* * *
 {¶ 43} "(2) If the allegations of the complaint, indictment, or information are admitted or proven, do any one of the following, unless precluded by statute:
 {¶ 44} "* * *
 {¶ 45} "(d) Dismiss the complaint if dismissal is in the best interest of the child and the community."
 {¶ 46} "Juvenile Rule 29(F)(2) vests the trial court with discretion to adjudicate and dispose of a case. (Internal citation omitted). Whether a delinquency proceeding should be dismissed or reach the merits is within the sound discretion of the trial judge. (Internal citation omitted). A dismissal under Juv.R.(F)(2)(d), however, must be based *Page 14 
upon the `best interest of the child and the community.' The standard of review in this context is abuse of discretion." (Internal citation omitted). In re Arnett, Hancock App. No. 5-04-20, 2004-Ohio-5766.
 {¶ 47} R.H. relies upon In re M.D. (1988), 38 Ohio St.3d 149,527 N.E.2d 286, a case involving a girl who was 12 at the time of the incident, and who was charged with one count of complicity to rape. M.D. was playing "doctor" with her nine year old sister and two five year olds, and she told the five year old boy to put his penis into the mouth of the five year old girl to take her temperature. M.D. was adjudicated a delinquent child and placed on probation. The Supreme Court of Ohio determined, since fellatio requires either stimulation or sexual satisfaction, or both, neither of which were demonstrated in the record, "fellatio did not occur * * *, thus no rape was committed to which appellant could be an accessory." Further, "to bring such charges in juvenile court, under the instant circumstances, is contrary to R.C. Chapter 2151 and Juv.R. 9(A) * * * and thus constitutes a denial of due process of law." The court determined that the goals of the juvenile court system are "most effectively met at the initial intake of the juvenile by the juvenile court. The overriding rule upon intake of a child is that formal court action should be a last resort to resolving juvenile problems." The Court vacated the juvenile's adjudication, noting that "[n]othing in the record or in the arguments of the prosecutor persuades us that the `best interest of the child and the public' were served by filing the instant complaint."
 {¶ 48} R.H. also relies upon the following three cases: In reSmith, 80 Ohio App.3d 502, 609 N.E.2d 1281 (affirming dismissal of rape charges against 10 year old boy without a referee-recommended evidentiary hearing regarding the boy's capability *Page 15 
for the sexual behavior alleged, but noting, "Had we been sitting as the juvenile court, we would have been inclined to approve the recommendation of the referee that a preliminary hearing be held to determine whether the matter should proceed on the charge of rape or be diverted for treatment or amended to a more appropriate charge"); In reArnett, Hancock App. No. 5-04-20, 2004-Ohio-5766 (holding juvenile court abused its discretion in dismissing rape charges where court focused on consensual and nonviolent nature of incidents, factors which are not defenses, and where the case was submitted on counsel's joint stipulation and there were accordingly no factual or legal determinations in the record "to distinguish the Juv.R.29(F)(2)(d) dismissal of this case from every other juvenile delinquency case involving a twelve year old and a fifteen year old under the same charge"); and In re N.K., Cuyahoga App. No. 82332, 2003-Ohio-7059
(affirming delinquent adjudications for rape and gross sexual imposition where force was exerted against one victim, and where the delinquent was 12 and the victims were five years old, and noting, "The Ohio Supreme Court has approved delinquency proceedings against children under thirteen when the allegations include force or the threat of force, limiting In re M.D. to circumstances involving consensual sexual contact").
 {¶ 49} The State relies upon In re Carter (1996), Butler App. No. CA95-05-087. In Carter, a 13 year old boy was adjudicated delinquent after he sexually abused his eight and nine year old sisters over a two month period by placing his penis into their vaginas and touching their vaginal areas and buttocks. In affirming the juvenile court, the Twelfth District determined,"It is clear from the language of Juv.R. 9 that formal court action is permissible in appropriate cases, and that it is within the discretion of *Page 16 
the juvenile court to proceed in such a manner." It was significant to the Carter court that the victims were the offender's much younger sisters, that the activity between them was not consensual, and that the offender admitted to experiencing uncontrollable sexual urges.
 {¶ 50} Having reviewed the record, we conclude that the juvenile court neither abused its discretion nor deprived R.H. of due process of law in overruling his objections. It was within the court's discretion to determine that court action was appropriate. Further, the authorities cited by R.H. in his brief do not support his position. In re M.D.
involved children playing "doctor," and their conduct was not sexual in nature; there was no rape. This matter was not submitted by joint stipulation on a police report as in In re Arnette,
 {¶ 51} and there is evidence in the record before us that the activity herein was sexual, forceful and nonconsensual, as in Carter. R.H. understood the sexual nature of his conduct, and he boasted of it to his neighbor and even his mother, making clear that he and the victim were not engaged in innocent child's play.
 {¶ 52} R.H. also argues that his prosecution was discriminatory, since no charges were brought against Ben and Zack. According to R.H., "the invidious treatment of R.H. calls all the more for a Rule 9 or Rule 29 dismissal."
 {¶ 53} "The law is well settled that the government is subject to constitutional restraints in its choice of those whom it may prosecute. * * * The conscious exercise of some selectivity in enforcement is not in itself, however, a violation of the United States Constitution. (Internal citation omitted). In order for selective enforcement to reach the level of unconstitutional discrimination the discrimination must be `intentional *Page 17 
or purposeful.' (Internal citation omitted). This concept of `intentional or purposeful discrimination' was explained in UnitedStates v. Berrios (C.A.2, 1974), 501 F.2d 1207, 1211, as follows:
 {¶ 54} To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. These two essential elements are sometimes referred to as `intentional and purposeful discrimination.'" State v. Flynt (1980), 63 Ohio St.2d 132,407 N.E.2d 15.
 {¶ 55} While it may seem unfair that Ben and Zack were not prosecuted, although there were allegations that they engaged in conduct similar to R.H.'s, there is no evidence in the record that the State intentionally or purposefully prosecuted R.H. due to his race, religion or a desire to deny him his constitutional rights. The juvenile court noted, "Sometimes it turns out that people who tell the truth, unfortunately, put themselves in a situation where they incriminate themselves, and that's why the court found [R.H.] responsible, because he did incriminate himself." The State's failure to prosecute Ben and Zack does not negate R.H.'s responsibility for his conduct, and the State's prosecution of R.H. alone is not discriminatory.
 {¶ 56} There being no abuse of discretion, denial of due process, and discriminatory prosecution, R.H.'s third assignment of error is overruled. *Page 18 
 {¶ 57} R.H.'s fourth assignment of error is as follows:
 {¶ 58} "THE APPELLANT ALSO CHALLENGES THE FINDINGS OF SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 59} Our determination to reverse and remand this matter based upon R.H.'s first assignment of error renders moot analysis of the sufficiency and the manifest weight of the evidence.
 {¶ 60} Judgment reversed and remanded.
GRADY, J., concurs.