[Cite as *In re J.S.*, 2016-Ohio-255.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

IN RE:

      CASE NO.  9-15-26

    J.S.,

ALLEGED DELINQUENT CHILD.      **O P I N I O N**

[STATE OF OHIO – APPELLANT]


**Appeal from Marion County Common Pleas Court
Family Division
Trial Court No. 15 DL 0162**

**Judgment Reversed and Cause Remanded**

**Date of Decision:   January 25, 2016**


**APPEARANCES:**

    *Matthew P. Frericks* **for Appellant**

    *David H. Lowther* **for Appellee**

**PRESTON, J.**

{¶1} Appellant, the State of Ohio, appeals the June 30, 2015 and July 1, 2015 judgment entries of the Marion County Court of Common Pleas, Family Division, granting appellee's, J.S., motion to suppress evidence and suppressing statements J.S. made during interrogation by law enforcement officers. For the reasons that follow, we reverse.

{¶2} On April 27, 2015, a complaint was filed against J.S. charging him with Count One of aggravated arson in violation of R.C. 2909.02(A)(1), a felony of the first degree if committed by an adult, and Count Two of aggravated arson in violation or R.C. 2909.02(A)(2), a felony of the second degree if committed by an adult. (Doc. No. 4). The complaint arose from an April 22, 2015 incident in which J.S., a juvenile, and another juvenile allegedly set fire to an abandoned warehouse in Marion, Ohio. (*Id.*); (June 20, 2015 Tr. at 5).

{¶3} On April 28, 2015, the State filed a "Notice of State's Intent to Seek a Serious Youthful Offender Dispositional Sentence." (Doc. No. 5). Also on April 28, 2015, J.S. filed a written denial of all of the counts in the complaint. (Doc. No. 6).

{¶4} On May 27, 2015, J.S. filed a motion to suppress statements he made "on or about April 23, 2015, in connection with any interview by an officer of the Marion City Police Department." (Doc. No. 23). J.S. argued that he was in custody when Officer Ben Graff ("Graff") of the Marion City Police Department

questioned J.S. at his residence with his father present without informing J.S. of his *Miranda* rights. (*Id.*).

{¶5} The trial court held a suppression hearing on June 25, 2015. (June 25, 2015 Tr. at 1). One witness—Graff—testified at the hearing. (*See id.* at 3-31).

{¶6} The trial court issued its judgment entries on June 30, 2015 and July 1, 2015 granting J.S.'s motion to suppress and suppressing all statements made by J.S. as a result of the interrogation process, including statements J.S. made while being interviewed by Graff. (Doc. Nos. 30, 32). The trial court concluded that J.S. was in custody but not informed of his *Miranda* rights when he made incriminating statements. (Doc. No. 32).

{¶7} The State filed its notice of appeal on July 6, 2015 and raises two assignments of error for our review. (Doc. No. 33). Because it is dispositive, we address only the State's first assignment of error.

### Assignment of Error No. I

**The trial court erred and abused its discretion in granting appellee's motion to suppress evidence.**

{¶8} In its first assignment of error, the State argues that the trial court erred by granting J.S.'s motion to suppress. Specifically, the State argues that the totality of the circumstances surrounding the questioning of J.S. demonstrates that J.S. was not in custody when he made incriminating statements to Graff. Therefore, the State argues, Graff was not required to inform J.S. of his *Miranda*

rights. J.S. argues, on the other hand, that the trial court correctly suppressed J.S.'s statements because J.S. was subjected to a custodial interrogation without first being informed of his *Miranda* rights, and because, even assuming he was not in custody, J.S.'s statements were not voluntary. We agree with the State.

{¶9} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. *See also In re R.S.*, 3d Dist. Paulding No. 11-13-10, 2014-Ohio-3543, ¶ 14, citing *Burnside* at ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Burnside* at ¶ 8. *See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 710 (4th Dist.1997).

{¶10} "The Fifth Amendment to the United States Constitution provides individuals with protection against self-incrimination." *In re R.S.* at ¶ 15, citing *Chavez v. Martinez*, 538 U.S. 760, 765, 123 S.Ct. 1994 (2003). "'Juveniles are entitled both to protection against compulsory self-incrimination under the Fifth

Amendment and to *Miranda* warnings where applicable.'" *In re K.W.*, 3d Dist. Marion No. 9-08-57, 2009-Ohio-3152, ¶ 12, quoting *State v. Thompson*, 7th Dist. Jefferson Nos. 98 JE 28 and 98 JE 29, 2001 WL 69197, *8 (Jan. 24, 2001), citing *In re Gault*, 387 U.S. 1, 54, 87 S.Ct. 1428 (1967).

{¶11} "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602 (1966). "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. "Police are not required to administer *Miranda* warnings to every person they question." *In re R.S.* at ¶ 16, citing *State v. Biros*, 78 Ohio St.3d 426, 440 (1997), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711 (1977). Rather, a police officer is required to administer *Miranda* warnings only where the individual questioned is subject to "custodial interrogation." *Id.*, citing *Biros* at 440, citing *Mathiason* at 494. *See also In re K.W.* at ¶ 12 ("Since custodial interrogation is inherently coercive, statements from those interrogations not preceded by the *Miranda* warnings are not admissible."), citing *In re R.H.*, 2d Dist. Montgomery No. 22352, 2008-Ohio-773, ¶ 17.

**{¶12}** "[T]o determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, ¶ 27, citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457 (1995). "The first inquiry is distinctly factual." *In re R.S.*, 2014-Ohio-3543, at ¶ 17, citing *Keohane* at 112. "Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry' of whether there was a '"formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Hoffner* at ¶ 27, quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517 (1983), quoting *Mathiason* at 495. "The subjective views harbored by either the interrogating officers or the person being questioned are of no consequence in the *Miranda* analysis." *In re R.S.* at ¶ 17, citing *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526 (1994).

**{¶13}** "In resolving 'the ultimate inquiry' courts must consider the totality of the circumstances surrounding the questioning." *Id.*, citing *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995) and *Beheler* at 1125. Relevant factors to consider in determining whether a custodial interrogation took place are: (1) the mentality and prior criminal experience of the accused; (2) the location of the questioning;

(3) the duration of the questioning; (4) the intensity and frequency of interrogation; (5) statements made during the interview; (6) the presence or absence of physical restraints; (7) the existence of physical deprivation or mistreatment; (8) the existence of threat or inducement; and (9) whether the interviewee was released at the end of the interview. *Id.*, citing *State v. Billenstein*, 3d Dist. Mercer No. 10-13-10, 2014-Ohio-255, ¶ 44, citing *Howes v. Fields*, ___ U.S. ___, 132 S.Ct. 1181, 1189 (2012); *In re K.W.*, 2009-Ohio-3152, at ¶ 12, citing *Thompson*, 2001 WL 69197, at *8. "[T]he United States Supreme Court held that a juvenile's age may be considered in the *Miranda* analysis, so long as the juvenile's age was known to the officer at the time of questioning or would have been objectively apparent to a reasonable officer." *In re R.S.* at ¶ 18, citing *J.D.B. v. North Carolina*, 564 U.S. 261, 131 S.Ct. 2394 (2011). "While a juvenile's age may be considered in the *Miranda* custody analysis, the Supreme Court cautioned that 'this does not mean that a child's age will be a determinative, or even a significant, factor in every case * * *.'" *Id.*, quoting *J.D.B.* at syllabus.

**{¶14}** "Separate from the issue of compliance with *Miranda* in custodial interrogations is the voluntariness of the pretrial statement." *In re R.L.*, 2d Dist. Montgomery No. 26232, 2014-Ohio-5065, ¶ 21, citing *In re N.J.M.*, 12th Dist. Warren No. CA2010-03-026, 2010-Ohio-5526, ¶ 18, citing *State v. Chase*, 55 Ohio St.2d 237, 246 (1978). "Even where *Miranda* warnings are not required, 'a confession may [still] be involuntary [and excludable] if on the totality of the

-7-

circumstances, the defendant's will was overcome by the circumstances surrounding the giving of the confession.'" (Brackets sic.) *In re N.J.M.* at ¶ 18, quoting *State v. Fille*, 12th Dist. Clermont No. CA2001-08-066, 2002-Ohio-3879, ¶ 15, citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326 (2000).

**{¶15}** We begin with a review of the relevant facts in this case. After comparing the factual findings in the trial court's July 1, 2015 judgment entry with the transcript of the suppression hearing, we decline to defer to the trial court's findings of fact because the trial court failed to recite and consider the totality of the circumstances. *See State v. Way*, 12th Dist. Butler No. CA2008-04-098, 2009-Ohio-96, ¶ 31-34 (declining to defer to the trial court's version of the facts because the trial court failed to consider the totality of the circumstances).

**{¶16}** At the suppression hearing, Graff testified that on April 22, 2015, he was assigned to investigate an arson that took place at 142 North Vine Street in Marion, Ohio. (June 20, 2015 Tr. at 4). Graff's investigation led him to a juvenile suspect, C.C., who told Graff that J.S. was also involved in the arson. (*Id.* at 5, 16). However, C.C. gave Graff a similar but incomplete name for J.S., so Graff contacted the middle school resource officer who identified J.S. as the person to whom C.C. was likely referring. (*Id.* at 5, 16-17).

**{¶17}** According to Graff, he and two fire investigators went to J.S.'s house. (*Id.* at 5-8). Graff was not wearing his uniform and was instead dressed in plain clothes, with his badge visible and his firearm at his side. (*Id.* at 7-8, 20).

The two fire investigators were wearing khaki pants and black shirts with "the Fire Marshall emblem on [them]." (*Id.* at 8). Graff testified that when they arrived at J.S.'s residence, Graff and the fire investigators found him there with his cousin and told J.S. that they "needed to talk to him." (*Id.* at 5-6). According to Graff, they asked J.S. if his parents were home, and J.S. said that his father was at a nursing home. (*Id.* at 6). Graff and the fire investigators "asked that he call his dad and asked [sic] him to come home because we really needed to talk to him." (*Id.*). Graff testified that through his training, he is not required to have a parent present when questioning a juvenile, but, because of the seriousness of the offense, he wanted to afford J.S. the benefit of having his father present. (*Id.*).

{¶18} According to Graff, while they were waiting on J.S.'s father to arrive, Graff and one of the fire investigators "were kinda [sic] off to the side," and the other fire investigator engaged J.S. in conversation, but not about the arson investigation. (*Id.* at 7). Graff testified that J.S.'s father arrived within 10 or 15 minutes after Graff and the fire investigators arrived, at which time they began questioning J.S. in the house. (*Id.* at 6-9).

{¶19} When asked to describe the house, Graff testified that it "was in the process of being remodeled." (*Id.* at 8). Graff continued:

> [T]he room where we spoke with [J.S.] was open – was like a
> living room. There's a large, open room. There's another room
> behind us, not separated by a wall but the kitchen was * * * off to

my left behind me. And I think there's a stairwell off to my immediate left that went upstairs.

* * *

There's not doors closing every room off but the kitchen was closed off and * * * I think there's a little small hallway * * *. But the room where we were talkin' to [J.S.] was open.

(*Id.* at 8-9). Present when J.S.'s father arrived were J.S., J.S.'s father, J.S's brother, J.S.'s uncle, two cousins of J.S., Graff, and the two fire investigators. (*Id.* at 8). According to Graff, when he began questioning J.S., J.S.'s father was in the room, as well as one of the fire investigators. (*Id.* at 10). Others were coming and going from the room, but Graff could not recall who exactly was in the room. (*Id.*). J.S. was seated on a loveseat, and Graff was "six, eight feet away from him," with a coffee table between them. (*Id.* at 12). According to Graff, no one stood over J.S. or was in his space. (*Id.*).

{¶20} Graff testified that he did not read J.S. his *Miranda* rights before questioning him because "[w]e didn't think it was a custodial interview" because they were at his house and "hadn't told him he was under arrest." (*Id.* at 10). Graff elaborated:

We're at his house. He's free and we're in his home. We haven't told him he's under arrest. We haven't told him [sic] put hand cuffs out. We haven't threatened him with anything. We just

told him we wanted the truth, we wanted the story of what happened, to tell us what happened.

\* \* \*

[W]e just told him that we wanted the truth. We wanted to know what happened, to tell us what happened. We didn't make any threats to him, we didn't – there was no coercion.

\* \* \*

You know, \* \* \* in our minds he was not in custody because we're at his house. I – there's no safer place for him to be than at his house. His dad's there. He's at the comfort of his place. Where else is he gonna go? He's at home.

(*Id.* at 10-11, 16).

{¶21} When asked about J.S.'s demeanor during the interview, Graff testified, "[J.S.] was nervous. But he settled down into it and he told us what happened." (*Id.* at 11). When asked if J.S. was being elusive with his answers during the interview, Graff responded, "Initially, he was, but when we were able to counter with what we knew, \* \* \* he settled into it and told us what happened. But there was no raising voices, there was [sic] no threats." (*Id.* at 12). J.S. admitted to starting the fire. (*Id.* at 13-14).

{¶22} Graff testified that J.S.'s father was not present in the room for the entire interview. (*Id.* at 12). Graff elaborated:

I think the realization of what happened and what was – hit dad and it really – it devastated him. You know, it really bothered him. I can't express what was going on but he was really shaken – he wasn't angry. He wasn't mad. It was – I gotta use the word devastated.

\* \* \*

At what point, I don't know. I just knew he went into the kitchen. Again, that was in another room separated. \* \* \* [B]ut the doors were open.

(*Id.* at 12-13).

{¶23} According to Graff, he and the fire investigators questioned J.S. for "20 or 30 minutes." (*Id.* at 11). At no time did J.S. give Graff and the fire investigators an indication that he did not want to speak with them. (*Id.*). Graff testified that, in his experience, it was not a lengthy interrogation, and it was not "difficult as far as thee [sic] admission." (*Id.* at 14). Graff was a School Resource Officer at a middle school and, in that position, received specific training concerning interviewing juveniles. (*Id.*). Graff agreed that that training "[came] into play here." (*Id.*). When asked if Graff was aware at the time of the interview or became aware after the interview "of any prior contact [J.S.] had with Law

Enforcement," Graff responded, "I'm aware now, yes."[1] (*Id.*). At the conclusion of the interview, J.S. was arrested and taken in a cruiser to the juvenile detention center. (*Id.* at 16, 18).

**{¶24}** On cross-examination, Graff testified that when he arrived at J.S.'s residence, J.S. and his cousin were on the front porch. (*Id.* at 20). Graff approached but did not walk onto the porch and identified himself as a police officer. (*Id.*). According to Graff, his badge and firearm were visible to J.S. (*Id.*). J.S. is 13 years old[2] and "smaller," Graff testified. (*Id.* at 21). Graff testified that he is six feet, one inch tall and 255 pounds. (*Id.*). One of the fire investigators is larger than Graff, and the other "is shorter but stalky [sic]." (*Id.* at 22). Graff agreed that they are "three pretty good sized men." (*Id.*). Graff admitted that while he could not recall the exact language used, they said to J.S. something to the effect, "[W]e need to talk to you. Would you please call your dad?" (*Id.* at 23). Between the time when Graff and the fire investigators first approached the front porch and the time J.S.'s father arrived, they made only "small talk" with J.S.

---

[1] J.S.'s counsel did not object to this question and answer. (*See* June 20, 2015 Tr. at 14-15). However, when asked to elaborate on J.S.'s prior contact with law enforcement, J.S.'s counsel objected based on relevance, arguing that testimony concerning J.S.'s prior contact with law enforcement would be relevant only if Graff was aware of it at the time of the questioning. (*Id.* at 15). The test that courts apply to resolve whether there was a custodial interrogation is an objective one under which the subjective knowledge of the officer and accused is irrelevant. *Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, at ¶ 27, citing *Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517; *In re R.S.*, 2014-Ohio-3543, at ¶ 17, citing *Stansbury*, 511 U.S. at 323, 114 S.Ct. 1526. Notwithstanding the objective nature of the test, the trial court sustained J.S.'s counsel's objection, concluding that because Graff was unaware of J.S.'s prior contact with law enforcement at the time he interviewed J.S., J.S.'s prior contact with law enforcement is irrelevant. (*See* June 20, 2015 Tr. at 16). Nevertheless, as we will explain below under the State's second assignment of error, in light of our disposition of the State's first assignment of error, we need not address this issue.
[2] Defendant's Exhibit 1 from the suppression hearing contains J.S.'s date of birth, which indicates that he was 14 years old on the day that Graff and the fire investigators interviewed J.S. at his home.

(*Id.* at 25). Graff admitted that, had J.S. "decided to start walking down the street" at that point, he probably would have stopped him. (*Id.* at 24). During the time they were waiting for J.S.'s father, Graff testified, "[J.S.'s] cousin was in and out of the house but [J.S.] sat out on the front porch with us. Then once dad got home we all went into the house." (*Id.* at 25).

{¶25} Graff testified that, during the interview in the house, he said to J.S., "You need to tell us the truth," and, "You need to tell us what happened." (*Id.* at 26). Graff never told J.S. or J.S.'s father that J.S. did not need to talk to Graff and the fire investigators. (*Id.* at 24-25, 27). Nor did Graff tell J.S. or J.S.'s father that J.S. could leave. (*Id.* at 24, 27). Graff testified that they did not arrest J.S. right after the interview; however, Graff eventually placed handcuffs on J.S. and placed him in a marked patrol car for which Graff called. (*Id.* at 28). Graff called for the marked patrol car because his vehicle was unmarked. (*Id.*).

{¶26} On the trial court's examination, Graff testified that, while J.S. was not immediately arrested, he was arrested before he left the residence. (*Id.* at 29). Graff recalled that after J.S.'s father arrived, and while Graff was in the front yard, he informed J.S.'s father, in J.S.'s presence, that Graff and the fire investigators were investigating a fire and needed to speak with J.S. (*Id.*).

{¶27} On re-direct examination, Graff testified that, before placing J.S. under arrest, Graff gave no indication that J.S. was in custody. (*Id.* at 30).

{¶28} At the conclusion of the hearing, the trial court said that it was "deeply concerned" about the interrogation for several reasons, many of which related to Graff's state of mind during the interrogation, including Graff's testimony that he probably would not have allowed J.S. to leave the residence. (*See id.* at 36-37). The trial court "suppress[ed] any statements made by the juvenile as a result of thee [sic] interrogation process," including a written statement J.S. provided to law enforcement.[3] (*Id.* at 38). In its judgment entry granting J.S.'s motion to suppress, the trial court, at times, applied an objective test to resolve whether there was a custodial interrogation; however, at other points in its entry, the trial court focused impermissibly on the subjective views harbored by Graff. (*See* Doc. No. 32). For example, the trial court stated, "The detective also testified that he realized their investigation of the alleged offenses would be more difficult if [J.S.] did not speak to them freely which was another reason he did not advise [J.S.] or his Father of their legal rights." (*Id.*).

{¶29} Balancing the totality of the circumstances surrounding the questioning in this case, "we recognize there are factors weighing both for and against a finding that the interview was custodial." *In re B.J.*, 11th Dist. Lake No. 2013-L-091, 2014-Ohio-5701, ¶ 19. Ultimately, however, we conclude that J.S.

---

[3] The completed written statement form, Defendant's Exhibit 1, is dated "4/23/15" but also provides, "This statement was completed * * * on the 23 day of *February* 2015." (Emphasis added.) (Defendant's Ex. 1). Given that the alleged arson occurred on April 22, 2015, it appears that the February 23, 2015 date was written in error. (*Id.*). Moreover, the record is unclear concerning when J.S. provided the written statement relative to Graff and the fire investigators questioning him at his home; however, J.S. appears to have provided the written statement after he was arrested following the questioning.

was not in custody when Graff and the fire investigators questioned him. Weighing in favor of a finding that the interview was custodial is that Graff did not simply request to speak with J.S. and instead told J.S., "We need to talk to you," and that they "wanted the truth." *See id.* Graff and the fire investigators are "three pretty good sized men" compared to J.S., who is "smaller." Graff's badge and firearm were visible to J.S. *See In re R.H.*, 2008-Ohio-773, at ¶ 20. Graff did not inform J.S. or his father that J.S. did not need to speak with him and that J.S. could leave at any time. *See In re B.J.* at ¶ 19. J.S. was initially nervous during the interview. J.S.'s father was not present for the entire interview. *See In re R.H.* at ¶ 20. Finally, although J.S. was not arrested "immediately" after the questioning, he was arrested that day before he left the residence, placed in a cruiser, and taken to the juvenile detention facility. *Compare In re R.S.*, 2014-Ohio-3543, at ¶ 26.

{¶30} Other, more numerous factors weigh against a finding that the interview was custodial. Graff and the fire investigators did not begin questioning J.S. until his father arrived. *See In re B.J.* at ¶ 19, citing *In re C.M.*, 8th Dist. Cuyahoga No. 99599, 2013-Ohio-5426, ¶ 42-44. While waiting for J.S.'s father, Graff and the fire investigators waited outside on the front lawn; they did not enter into an enclosed space with J.S. While Graff's badge and firearm were visible to J.S., Graff and the fire investigators were wearing plain clothes, and they arrived in an unmarked vehicle. *See In re J.C.*, 11th Dist. Geauga No. 2011-G-3017,

2011-Ohio-5864, ¶ 76. Once J.S.'s father arrived, the questioning occurred in a large, open, living-room space in J.S.'s own home. *See In re Gunton*, 9th Dist. Wayne No. 2890, 1994 WL 581435, *2 (Oct. 19, 1994). The room had openings, not separated by doors, to other rooms. In addition to J.S., Graff, and the fire investigators, five other people were present at the house once J.S.'s father arrived—all of them J.S.'s relatives. People came and went from the living room during the interview. Although Graff and the fire investigators were large relative to J.S.'s size, none of the men invaded J.S.'s space. In fact, Graff and J.S. were separated by six to eight feet during the interview, and a coffee table was between them.

{¶31} Aside from telling J.S. that they wanted the truth, Graff and the fire investigators did not threaten or coerce J.S. *See In re R.L.*, 2014-Ohio-5065, at ¶ 28. Although J.S. was at first nervous and elusive during the interview, "he settled down into it" and told Graff and the fire investigators what happened. While J.S.'s father was not present for the entire interview, when he did leave the room after becoming "devastated," he went to the adjacent kitchen, and the door was open between the living room and kitchen. The interview was not intense and lasted only a short time—20 or 30 minutes. *See In re B.J.* at ¶ 19 (stating that an interview "lasting less than 30 minutes" "was of a short duration"). J.S. had prior contact with law enforcement. *See In re R.S.* at ¶ 26. Finally, J.S. was 13 or 14 at the time of the interview, and J.S.'s "age was known to the officer at the time of

questioning or would have been objectively apparent to a reasonable officer" because Graff learned of J.S.'s identity through J.S.'s middle school's resource officer.

{¶32} Under the particular facts of this case, we conclude that J.S. was not in custody when he was interviewed at his residence by Graff and the fire investigators. Therefore, Graff was not required to inform J.S. of his *Miranda* rights before questioning him. The trial court erred in concluding that J.S. was in custody at the time of his interrogation and in granting J.S.'s motion to suppress his statements.

{¶33} In support of his argument that the trial court correctly concluded that he was in custody, J.S. argues that "Graff intentionally did not advise [J.S.] of his rights because it would make their investigation more difficult." (Appellee's Brief at 5). The trial court made similar statements in its analysis. (*See* Doc. No. 32). However, J.S.'s argument and the trial court's analysis ignore that the subjective views harbored by the interrogating officer "are of no consequence in the *Miranda* analysis." *In re R.S.*, 2014-Ohio-3543, at ¶ 17. There is no evidence that Graff's subjective views were made relevant by a communication to J.S. of Graff's reasons for not informing J.S. of his *Miranda* rights. *See State v. Sell*, 2d Dist. Montgomery No. 26458, 2015-Ohio-1940, ¶ 17; *State v. Cherry*, 9th Dist. Summit No. 20771, 2002-Ohio-3738, ¶ 58. Therefore, we reject J.S.'s argument.

{¶34} For reasons similar to those discussed above in our custodial-interrogation analysis, we conclude that J.S.'s statements were not involuntary. As we discussed above, Graff and the fire investigators interviewed J.S. in his own home with multiple relatives present. They did not act coercively other than to tell J.S. to tell the truth, did not threaten J.S., did not employ deprivation or inducement, and did not prevent the involvement of J.S.'s father while J.S. was being questioned. *See In re R.L.*, 2014-Ohio-5065, at ¶ 28; *In re J.M.*, 3d Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 24-25. Considering the totality of the circumstances, including J.S.'s youth, we conclude that, because J.S.'s will was not overcome by the circumstances surrounding the giving of the confession, his statements were not involuntary.

{¶35} For the reasons above, we conclude that, because J.S. was not in custody at the time he was questioned, and because his statements were not involuntary, the trial court erred in granting J.S.'s motion to suppress and in suppressing statements made by J.S.

{¶36} The State's first assignment of error is sustained.

### Assignment of Error No. II

**The trial court erred in sustaining an objection thus not allowing the introduction of relevant evidence which would go to the totality of the circumstances.**

**{¶37}** In its second assignment of error, the State argues that the trial court erred by sustaining J.S.'s objection to evidence concerning specific details of J.S.'s prior contact with law enforcement.

**{¶38}** In light of our decision to sustain the State's first assignment of error, its second assignment of error is rendered moot, and we decline to address it. *See State v. Tyson*, 3d Dist. Marion No. 9-14-49, 2015-Ohio-3530, ¶ 39, citing *State v. Duke*, 9th Dist. Lorain No. 12CA010225, 2013-Ohio-743, ¶ 14, citing App.R. 12(A)(1)(c).

**{¶39}** Having found error prejudicial to the appellant herein in the particulars assigned and argued, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**